# United States Court of Appeals
## For the First Circuit

No. 04-2352

BASILIO TORRES-RIVERA ET AL.,

Plaintiffs, Appellants,

v.

SILA MARÍA CALDERÓN-SERRA ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Lynch, Circuit Judge,
Baldock,[*] Senior Circuit Judge,
and Lipez, Circuit Judge.

Fernando L. Gallardo and Antonio Borrés-Otero, with whom Woods & Woods LLP was on brief, for appellants.
Luis Sánchez-Betances, with whom Gerardo De Jesús Annoni and Sánchez-Betances & Sifre, P.S.C. were on brief, for appellees.

June 14, 2005

---

[*]Of the Tenth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**.  The basic question posed by this action is whether political association rights under the First Amendment to the Constitution of the United States act as a check on a legislature enacting a statute reorganizing an administrative agency and a check on the executive who signed and then implemented the law.  Here, the legislature of Puerto Rico reorganized the Industrial Commission by reducing the number of Commissioners who hear workers' compensation claims from twenty-five to five, and the governor signed the bill and then implemented it.  There is no claim that the governor, in implementing the new legislation, did not apply the same interpretation of the statute regardless of political affiliation of the former Commissioners.  Under that uniform interpretation, she concluded that the new statute eliminated all of their positions.  Some of the Commissioners, terminated from employment, sued in federal court under 42 U.S.C. § 1983.  The district court dismissed the action.  See Torres-Rivera v. Calderón-Serra, 328 F. Supp. 2d 237 (D.P.R. 2004).  We affirm the judgment of dismissal against the plaintiffs on all claims.

## I.

Within the past decade, the Commonwealth of Puerto Rico has used three different organizational structures for the Industrial Commission, the administrative agency which handles workers' compensation claims.  In the years before 1996 (indeed,

-2-

since 1935) the Commonwealth had long structured the Industrial Commission as having a maximum of five Commissioners. To assist the Commissioners, there was also a system, put in place since 1969, of hearing examiners who would make recommendations to the five Commissioners, who would then make a final adjudication of the claims by majority vote.

However, on July 1, 1996, Governor Pedro Rossello, whose New Progressive Party (NPP) had recently gained the governorship, signed Law 63, codified at 11 P.R. Laws Ann. § 8. Law 63 increased the number of Commissioners from five to twenty-five and provided each Commissioner with a definite term of ten years in office. Each Commissioner was appointed by the Governor with the advice and consent of the Senate. Each Commissioner was given authority to make a final adjudication of the claims before him or her independently. Law 63 also stated that Commissioners appointed prior to its effective date would remain in office until their original terms expired. Law 63 did not explicitly state what would happen to the hearing examiners.

There was another change in control of the executive branch of the Commonwealth in November 2000, when the Popular Democratic Party (PDP) took over the governor's office. On March 25, 2003, Governor Sila María Calderón-Serra ("Governor Calderón") signed Law 94, which amended 11 P.R. Laws Ann. § 8 by establishing a new structure for the Industrial Commission. The preamble to Law

-3-

94 cited problems of great inefficiency with the functioning of the Industrial Commission and recounted a large number of complaints from the citizenry about long delays in the handling of cases in that office. By contrast with Law 63, Law 94 returned the number of Commissioners to five, to be appointed by the Governor with the advice and consent of the Senate for fixed terms of six years (except the Chairman[1] of the Commission, whose term ends on December 31 of the year in which general elections are held). The law specified that of the five Commissioners, three should be lawyers, one should be a doctor with "acclaimed knowledge and interest in the field of occupational medicine" and one should be "a person of known sympathy for and identification with Puerto Rico's organized workers' movement."

Despite requests from the minority parties, and unlike its predecessor statute, Law 63, the legislature put no provisions in Law 94 as to the fate of the positions of the twenty-five previous Commissioners who had been appointed before its enactment. See Torres-Rivera, 328 F. Supp. 2d at 240. Law 94 simply did not address the status of the incumbent Commissioners. Still, Law 94 employs prospective language to describe the structure of the Industrial Commission. For example, it states that "[a] commission

---

[1] This position is alternately referred to as "President" and "Chairman" in the translation of Law 94 and the parties' briefs and pleadings. For consistency, this opinion uses the term "Chairman."

-4-

to be called 'Industrial Commission of Puerto Rico' is created, which will have five (5) Commissioners" (emphasis added). The statute also created career positions for a group of hearing examiners, designated by the Industrial Commission's Chairman.[2] Those hearing examiners make recommendations to the Commissioners rather than make final determinations on their own. On April 11, 2003, the Senate approved the Governor's nomination of Gilberto M. Charriez-Rosario ("Charriez") as Chairman of the Industrial Commission. Three other new Commissioners assumed office that day. The fifth Commissioner was not appointed at the time when the plaintiffs filed this suit.

Charriez lost little time in carrying out the legislature's reforms. He sent written notices to all of the former Commissioners informing them that he was the new Chairman of the Industrial Commission. There was some scuffling with the former Chairman of the Commission, Basilio Torres-Rivera ("Torres"), who took the position that he was the legal Chairman until his term expired on June 30, 2006. The details of this dispute are not pertinent to our present discussion.

---

[2]   While the text of the statute does not specify the number of hearing examiners, all parties assert in their appellate briefs that the number of hearing examiners is twenty-five.

On April 14, 2003, the Secretary of State for the Commonwealth at the time, Ferdinand Mercado,[3] sent letters to all persons who had occupied the twenty-five Commissioners' positions, terminating their positions at the Industrial Commission effective that day.

As frequently happens with such disputes in Puerto Rico, the matter was brought to federal court.[4] Fourteen of the former Commissioners, including Torres as lead plaintiff, sued.[5] The complaint, brought under 42 U.S.C. § 1983 and Puerto Rico law asserted a variety of claims in furtherance of their argument that they could not be removed from their jobs as Commissioners, despite the restructuring of the Industrial Commission. The first count alleged that Law 94 was unconstitutional both on its face and as applied to the plaintiffs because it was void for vagueness and because it permitted interference with a fundamental First

_____

[3]    Ferdinand Mercado is not a party to this case. The complaint describes him as "Interim Governor," perhaps acting in the absence of other officials.

[4]    "With each change in administration -- at both the commonwealth and municipal levels -- the federal district courts in Puerto Rico are flooded with hundreds of political discrimination cases, many of which are appealed." Sanchez-Lopez v. Fuentes-Pujols, 375 F. 3d 121, 126 (1st Cir. 2004).

[5]    The other plaintiffs were a group of employees of the Industrial Commission who had occupied trust positions and who had also been terminated, and the spouses of the Commissioners and the trust employees and their conjugal partnerships. The claims of these other plaintiffs are wholly derivative of the claims of the former Commissioners, and we do not discuss them further.

Amendment right of the plaintiffs by allowing for political discrimination. The count also alleged that the acts of the Governor in designating the new Commissioners were illegal in that they deprived the old Commissioners of their rights of free speech and freedom of association.

The second count purported to sound in federal law but actually was based on Puerto Rico law. It argued that Law 94, properly interpreted, did not provide for the discharge of the plaintiffs. The third claim for relief was a federal procedural due process claim. It was also based on interpretation of Puerto Rico law, particularly that Law 94 did not revoke those provisions of Law 63 which provided the plaintiff former Commissioners with fixed terms. The fourth count was one for deprivation of substantive due process; it also denied that there was a legitimate efficiency problem with the operation of the Industrial Commission which had justified a change in its structure. The fifth claim for relief purported to be based on the plaintiffs' "protected liberty interests" and seemed to assert that the plaintiffs' reputations had been damaged by this action. The sixth cause of action was a Puerto Rico law claim for damages, under the supplemental jurisdiction of the federal court, based on Article 1802 of the Puerto Rico Civil Code.

The plaintiffs sought a declaration that Law 94 was unconstitutional, compensatory damages for lost pay and emotional distress, punitive damages, and reinstatement to their positions.

The defendants named were Governor Calderón, Cesar R. Miranda-Rodriguez, Governor Calderón's Chief of Staff, and Charriez, the new Chairman of the Industrial Commission. The defendants promptly moved to dismiss on grounds of legislative and qualified immunity and argued that certain claims failed to state a claim upon which relief could be granted.

The district court allowed the motion and entered judgment dismissing the federal claims with prejudice and the state claims without prejudice on August 5, 2004. See Torres-Rivera, 328 F. Supp. 2d at 244-45. The plaintiffs timely appealed.

**II.**

Our review of the judgment on the motion to dismiss is de novo. Arroyo-Melecio v. P.R. Am. Ins. Co., 398 F.3d 56, 65 (1st Cir. 2005). The plaintiffs have abandoned all arguments on appeal, save three: (1) that the statute is unconstitutional and that the district court's (2) legislative immunity and (3) qualified immunity findings were in error.

A. Constitutionality of the Statute

We address first the plaintiffs' appeal from the denial of declaratory relief that Law 94 is unconstitutional.

The plaintiffs bring Due Process and First Amendment claims against the statute. They argue that the statute is void for vagueness because it does not clearly address what is to happen to their jobs; as well, they argue that it embodied the legislature's intention to engage in and permitted political discrimination against the former Commissioners based on their political affiliation with the NPP, the party of the former governor.

We reject these arguments. There are no actionable claims that the enactment of this statute, Law 94, violates either the plaintiffs' First Amendment or Due Process rights.

We begin with the First Amendment claim. This statute is neutral on its face and says nothing about the political affiliations of the persons to be appointed to positions in the reorganized agency. This statute does not require that only members of one political party be named Commissioners or be allowed to work for the Industrial Commission. That would be a very different case. The statute simply reorganizes the agency, a task committed to the legislature.[6] See Acevedo-Garcia v. Vera-Monroig,

---

[6] This court has often rejected attempts by plaintiffs to challenge on First Amendment grounds loss of employment due to reorganizations of governmental agencies, whether the reorganization is effectuated by the legislature, by the governing board of the agency, or by the administrative head of the agency. See, e.g., Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1 (1st Cir. 2000) (municipal ordinance repealing prior ordinance granting career status to employees); Angulo-Alvarez v. Aponte de la Torre, 170 F.3d 246 (1st Cir. 1999) (mayor and municipal assembly adopting

204 F.3d 1, 8 (1st Cir. 2000) ("Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process." (internal quotation marks omitted)).

The plaintiffs' argument assumes there is an absolute right under the First Amendment to be protected against political affiliation discrimination. But "[t]he prohibition on encroachment of First Amendment protections is not an absolute." Elrod v. Burns, 427 U.S. 347, 360 (1976). The reason it is not absolute is that there "is the need for political loyalty of employees . . . to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." Id. at 367. The First Amendment political affiliation right described in the line of cases from Elrod to Branti v. Finkel, 445 U.S. 507 (1980), and Rutan v. Republican Party of Ill., 497 U.S. 62 (1990), is cabined by an exception designed to give room to elected representatives to make policy choices reflective of their party platforms. See Branti, 445 U.S. at 517-18; Rutan, 497 U.S. at 74.

---

plan to privatize department of maintenance and transportation); Vazquez v. Lopez-Rosario, 134 F.3d 28 (1st Cir. 1998) (governing board of commonwealth agency establishing reorganization plan which eliminated position of employee of government contractor).

Law 94 is an expression of policy choices made by elected representatives.

In the face of this statutory neutrality, the plaintiffs attempt to fashion a claim that the reorganization was both intended to and had the effect of accomplishing political affiliation discrimination. Even assuming dubitante such a claim could be made here, it does not advance the plaintiffs' case.

As to effect, there is no statutory invalidity from the fact that the statute may, in the end, lead to a situation in which the impact of the reorganization will be to disproportionally terminate the employment of members of one political party. We have rejected the application of a disparate impact theory in First Amendment political affiliation cases. "If uniformly applied personnel practices, predicated on legitimate reasons, result in terminations, those terminations are not unconstitutional because those affiliated with one political party are disproportionately impacted." Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 140 (1st Cir. 2004).[7]

---

[7] Even in the Fourteenth Amendment Equal Protection area, a showing of disproportionate impact alone is not enough to establish a constitutional violation. See Washington v. Davis, 426 U.S. 229, 239 (1976); Soto v. Flores, 103 F.3d 1056, 1067 (1st Cir. 1997). Although evidence of adverse effect may be pertinent to claims of gender- or race-based discrimination under the Equal Protection Clause, a plaintiff must still show purposeful discrimination. See Personnel Adm'r v. Feeney, 442 U.S. 256, 274 (1979).

As to intent, here the legislature explicitly stated its intent behind Law 94:  it found the expanded Commission system under Law 63 did not function effectively, leading to delays and complaints from the citizenry.  We will not look behind that express statement of intent as to a law neutral on its face.  Cf. Hill v. Colorado, 530 U.S. 703, 719-20 (2000) (content-neutrality inquiry in First Amendment context ends if stated legislative reason is content-neutral and the statute is facially neutral); McGuire v. Reilly, 386 F.3d 45, 57 (1st Cir. 2004) (same); McGuire v. Reilly, 260 F.3d 36, 44 (1st Cir. 2001) (same).

The plaintiffs' void-for-vagueness argument is equally hopeless.  The vagueness claim fails even if untethered from its dependence on its faulty First Amendment assumptions.  The vagueness that the plaintiffs point to is a vagueness about the fate of the old Commissioners in office at the time of the enactment of the statute.  Law 94 does not regulate speech and so raises no chilling effect concerns that people will steer too far clear of prohibited speech.  That is one area where the void-for-vagueness doctrine is used.  Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 93-94 (1st Cir. 2004).  Nor does the statute impose penalties on the plaintiffs for any conduct, but fail to give them fair warning that any such conduct would be impermissible, another area where the doctrine is used.  Id.  Further, the source of vagueness that the plaintiffs purport to identify raises no

-12-

concerns about excessive discretion that could be used in a discriminatory manner. See id. at 94.

The plaintiffs' void-for-vagueness claims are not made any more meritorious by the fact that when plaintiff Torres refused to vacate his office on Charriez' request, Charriez had Torres indicted for a claimed misdemeanor charge of usurping the position of Chairman (he was acquitted) and a felony charge of illegally retaining government property and documents (the charge was promptly dismissed). Torres was not arrested under Law 94 but under Puerto Rico's criminal laws.

B. Claims Against Individual Defendants for Damages

By contrast with the claim for injunctive or declaratory relief as to the constitutionality of the statute, the claims against the individual defendants for damages are subject to the doctrines of legislative and qualified immunity.

1. Signing of Law 94 By Governor

A state legislature (and for these purposes Puerto Rico is treated as a state) enjoys common law immunity for its legislative acts, an immunity similar to that accorded members of Congress under the Speech or Debate Clause. Supreme Court v. Consumers Union of the United States, Inc., 446 U.S. 719, 732 (1980). The question we are faced with here is extension of this

doctrine to the executive who signs legislation, thus making it law.[8]

Although no legislators are named as defendants, the plaintiffs bring a claim against Governor Calderón for having signed Law 94. The Supreme Court has held that "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." Bogan v. Scott-Harris, 523 U.S. 44, 55 (1998). The Supreme Court of a state is entitled to legislative immunity when its members act in a legislative capacity to promulgate a State Bar Code. Consumers Union, 446 U.S. at 734. As well, the President acts legislatively when he approves or vetoes bills passed by Congress. See Bogan, 523 U.S. at 55; cf. Edwards v. United States, 286 U.S. 482, 490 (1932) (noting "the legislative character of the President's function in approving or disapproving bills"). Likewise, a governor who signs into law or vetoes legislation passed by the legislature is also entitled to absolute immunity for that act. Women's Emergency Network v. Bush,

---

[8] The district court held that "Law 94 being classified as [a] legislative act by its nature, [the Governor's] signing it into law is protected by absolute legislative immunity and all claims against her stemming from this act must be dismissed." Torres-Rivera, 328 F. Supp. 2d at 243. We understand the court to have held only that the signing of Law 94 was protected by legislative immunity. The court later held that any actions by the defendants were protected by qualified immunity "insofar as they were carried out in accordance with or for the implementation of Law 94." Id. at 244. The plaintiffs misapprehend the ruling when they argue that the district court held that the Governor's implementation of the law was covered by legislative immunity.

-14-

323 F.3d 937, 950 (11th Cir. 2003) ("Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law."); cf. Smiley v. Holm, 285 U.S. 355, 372-73 (1932) (recognizing a governor's signing or vetoing of a bill is a part of the legislative process).

The plaintiffs argue that this legislative immunity may be abrogated if the enactment of the legislation was motivated by impermissible intent. That argument was expressly rejected by the Supreme Court in Bogan, which extended absolute legislative immunity from suit under § 1983 to local legislators for their legislative activities. Bogan, 523 U.S. at 54. The Court held that even where a jury found that constitutionally sheltered speech was a substantial or motivating factor behind an ordinance which eliminated a city department with only one employee, the mayor and head of the city council were absolutely immune from suit for damages under legislative immunity. Id. The Court held that before one asked about the defendants' subjective intent there was the "logically prior question of whether their acts were legislative." Id.

In the logically separate and prior inquiry as to whether the acts are legislative, the only inquiry relevant in this case, intent is not part of the analysis.[9] The Court instructed in

_____

[9] Of course, not everything a legislator does, even if done regularly, is a legislative act, Doe v. McMillan, 412 U.S. 306, 313 (1973), and not all conduct relating to the legislative process is

-15-

Bogan: "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." Id. The Court had little difficulty in concluding that the ordinance at issue had all the hallmarks of traditional legislation:

> The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office. And the city council, in eliminating [the department in which the plaintiff was the sole employee], certainly governed "in a field where legislators traditionally have power to act."

Id. at 55-56 (quoting Tenney v. Brandhove, 341 U.S. 367, 379 (1951)); see also Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 7-8 (1st Cir. 2000) (distinguishing the legislative activities in Bogan from non-immunized administrative decisions made by officials implementing a layoff plan: the plan's procedures and criteria were not observed; terminated employees were from one political party and were replaced by employees from the other political party; and

_____

a legislative act, see Gravel v. United States, 408 U.S. 606, 620 (1972) (Legislative immunity did not extend to "privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings."); Powell v. McCormack, 395 U.S. 486, 503 (1969).

-16-

there was evidence of political harassment).  Law 94 also has all the hallmarks of traditional legislation.

Tenney is even more explicit that there can be no inquiry into legislative motive no matter how corrupt, for purposes of § 1983 damages liability, so long as the state legislature is acting in traditional legislative areas.  Tenney, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege [of legislative immunity]. . . . [I]t [is] not consonant with our scheme of government for a court to inquire into the motives of legislators . . . .").  The same is true of the act of a governor in signing legislation.  The remedies are in the political processes.

2.  Claims Based on Actions By Executive to Implement Law 94

The plaintiffs also seek damages for the actions taken by Governor Calderón, Miranda-Rodriguez (Governor Calderón's Chief of Staff), and Charriez to implement the new legislation:  the naming of a new Chairman and new Commissioners, the notice to the plaintiffs that their positions had been eliminated, and the consequent termination of their employment.

The actions by the executive officials (including the governor) taken to implement legislation are not shielded by legislative immunity.  Under Scheur v. Rhodes, 416 U.S. 232 (1974), these implementation actions (as opposed to the governor's signing the law) should be evaluated under the qualified immunity doctrine,

rather than under legislative immunity.  Id. at 247-48.  The district court properly did so.

This circuit usually evaluates qualified immunity claims under a three-part test.  See, e.g., Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60-61 (1st Cir. 2004).  The first part of the test asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 61 (internal quotation marks omitted).  In the second stage, the question is "whether the right was clearly established at the time of the alleged violation such that a reasonable officer would be on notice that his conduct was unlawful."  Id. (internal quotation marks and alteration omitted).  And in the last stage, we ask "whether a reasonable officer, similarly situated, would understand that the challenged conduct violated the clearly established right at issue."  Id. (internal quotation marks omitted).

As we ordinarily must do, we start first with the question of whether the plaintiffs have stated a claim for violation of the First Amendment at all.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  We conclude they have not.

Under the plain language of Law 94, the Governor was entitled to appoint a Chairman of the Commission.  The First Amendment did not require the Governor to make her choice from the

-18-

existing twenty-five Commissioners. The same is true of the appointment of the other three Commissioners.

The claim concerning termination of the plaintiffs' employment, on different facts, could come out differently. If the plaintiffs had argued that the defendants had selectively replaced some of the previous Commissioners, but not others, using political affiliation as the criteria, the plaintiffs may have stated a claim. See Acevedo-Garcia, 204 F.3d at 10-11; Rutan, 497 U.S. at 65-66. But the plaintiffs have made no such claim; instead, the pleadings show that all Commissioners were terminated on the same neutral principle: that Law 94 eliminated the positions of all twenty-five previous Commissioners.

Whether the articulated neutral principle -- that the statute eliminated the positions -- is correct or not may raise a question of Puerto Rico law, but it does not state a First Amendment claim. There is no claim based on the First Amendment for disparate impact based on the political affiliation doctrine because "[i]t is in the nature of a change in administration that job actions by the new party in power will have a disparate impact on members of the outgoing party." Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 140 (1st Cir. 2004). To put it differently, even if under Puerto Rico law the plaintiffs turn out to have some sort of tenure, they still have no First Amendment claim. All

-19-

Commissioners' positions were eliminated on the basis that there was no such tenure; therefore, there was no discrimination.

**III.**

The judgment of dismissal is **<u>affirmed</u>**.  Appellees are awarded their costs on appeal.