POSNER, Circuit Judge,
dissenting.
I disagree with the decision in two respects that merit airing in a public dissent. The first is whether ex-Governor Blagojevich is entitled to legislative immunity in this RICO suit, as the majority believes, and the second is whether, as the majority does not believe, the Tax Injunction Act, 28 U.S.C. § 1341, bars the district court from imposing a constructive trust in favor of the casino plaintiffs on the money received by the racetracks under the 2006 and 2008 Illinois statutes that impose a 3 percent excise tax on the casinos and require that the proceeds be placed in a segregated state fund — the “Horse Racing Equity Trust Fund” — and then promptly disbursed to the racetracks to be used as prescribed by the statutes. Ill. Pub. Act 94-804, effective May 26, 2006; Ill. Pub. Act 95-1008, effective Dec. 15, 2008. It is sufficiently uncertain whether Blagojevich is entitled to immunity to warrant certifying the question to the Supreme Court of Illinois. But there is no doubt that the Tax Injunction Act bars the imposition by a federal district court of a constructive trust on revenues from the casino tax.
1. When a state employee is sued in federal court for violating a federal statute, whether he is immune from suit by virtue of his official status is a question of federal law, ordinarily federal common law. Supreme Count, of Virginia v. Consumers Union of the United States, Inc., 446 U.S. 719, 732, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); United States v. Gillock, 445 U.S. 360, 372 n. 10, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980); Bryant v. Jones, 575 F.3d 1281, 1304 (11th Cir.2009); Fowler-Nash v. Democratic Caucus of Pennsylvania House of Representatives, 469 F.3d 328, 330-31 (3d Cir.2006); National Ass’n of Social Workers v. Harwood, 69 F.3d 622, 629 (1st Cir.1995). Were the scope of official immunity determined by state law, a state could prevent the federal courts from enforcing federal statutes, such as RICO — which are frequently enforced against employees of state or local government, e.g., United States v. Genova, 333 F.3d 750 (7th Cir.2003); United States v. Thompson, 685 F.2d 993 (6th Cir.1982) (en banc); United States v. Long, 651 F.2d 239 (4th Cir.1981); United States v. Baker, 617 F.2d 1060 (4th Cir.1980) — to the full extent intended by Congress. What is unusual about this case is that the State of Illinois appears to give its governors less immunity than the federal common law might otherwise do; and why should federal courts grant defendants who are state employees a broader official immunity than those defendants would be entitled to if sued under state law? The interest in giving state officers immunity from suit is a state interest. If a state places no value on that interest in a particular setting, such as a suit against the state’s governor, there is no reason for a federal court, enforcing a federal statute, to grant the state official immunity from suit.
In Jorgensen v. Blagojevich, 211 Ill.2d 286, 285 Ill.Dec. 165, 811 N.E.2d 652 (2004), the Supreme Court of Illinois had to decide whether a suit on behalf of the state’s judges could be maintained against *542 the governor, who had vetoed a bill granting the judges a cost-of-living increase. The court ruled that the governor was not entitled to legislative immunity. (The court went on to hold, on the merits, that the veto violated a provision of the Illinois constitution that forbade reducing judges’ compensation, because the cost-of-living increase had vested and thus become a part of their compensation and therefore could not be rescinded. Id., 285 Ill.Dec. 165, 811 N.E.2d at 665-66.) The ruling on immunity was surprising because the Governor of Illinois, like the President of the United States, is effectively a third branch of the legislature by virtue of his veto power. Bogan v. Scott-Harris, 523 U.S. 44, 55, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998); Edwards v. United States, 286 U.S. 482, 490, 52 S.Ct. 627, 76 L.Ed. 1239 (1932). And so when a governor is performing his legislative role, as Governor Blagojevich was doing when he vetoed the cost-of-living bill, he is — or so one might think — entitled to the same immunity as legislators.
That is the general rule, Baraka v. McGreevey, 481 F.3d 187, 196-98 (3d Cir. 2007); Torres Rivera v. Calderón Serra, 412 F.3d 205, 212-13 (1st Cir.2005); Women’s Emergency Network v. Bush, 323 F.3d 937, 950 (11th Cir.2003); cf. Bogan v. Scott-Harris, supra, 523 U.S. at 55, 118 S.Ct. 966 (mayor), but it may not be the rule in Illinois after Jorgensen. The opinion said that the suit did not seek “to hold the Governor personally liable for his actions, nor are [the judges] attempting to force him to take or to refrain from taking any particular action. He was named in the litigation because he was one of the state officials involved in the sequence of the events which led to the failure of the Judges to receive their” cost-of-living increase. 285 Ill.Dec 165, 811 N.E.2d at 666. But the judgment nullified his legislative act — the veto — and the opinion goes on to note that “examples of Illinois governors being joined as defendants in cases seeking declaratory and injunctive relief based on alleged violations of state constitutional and legal requirements are commonplace.” Id. Presidents and governors are routinely enjoined from enforcing unconstitutional statutes, but — precisely because such statutes can be enjoined — it would be extremely odd to sue a President or a governor for having signed an unconstitutional bill into law; his act would be harmless. If such a suit is what Jorgensen permits, the Supreme Court of Illinois has modified traditional legislative immunity. The opinion goes on to state that “in Illinois, legislative immunity is addressed in” a constitutional and a statutory provision neither of which, the court ruled, “is applicable to the Governor.” Id. This sounds like the renunciation of a common law power to add to legislatively specified immunities.
But Jorgensen was an unusual case, and may not be applicable to our case. The legislative act enjoined was not a statute, but a veto by the governor; if not he, who would be sued? If he were granted immunity, there would be no way to nullify his unconstitutional act.
We cannot be certain, however, that the Illinois court would confine Jorgensen to vetoes. Legislative immunity is absolute, Bogan v. Scott-Harris, supra, 523 U.S. at 54-55, 118 S.Ct. 966; Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 403-05, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); Biblia Abierta v. Banks, 129 F.3d 899, 903-04 (7th Cir.1997), and the present suit accuses the governor of having signed the racetrack legislation because he had been bribed to do so. One can imagine the Supreme Court of Illinois, given its skepticism about granting a governor legislative immunity, holding that a governor has only a qualified immunity for his legislative acts — an *543 immunity that would not shield him from being sued for accepting bribes to sign laws. The court might think it odd that were Blagojevich convicted for criminal acts that included the racetrack bribe he could not be sued civilly for the same acts.
It is true that the federal common law of legislative immunity for state officials, since it is an immunity from civil suits, does not bar criminal actions, while barring civil actions even if based on charges of criminal misconduct. United States v. Gillock, supra, 445 U.S. at 372-73, 100 S.Ct. 1185. (The legislative immunity of federal legislators is broader because of the Constitution’s “speech or debate” clause. U.S. Const. art. I, § 6, cl. 1; United States v. Gillock, supra, 445 U.S. at 366-73, 100 S.Ct. 1185; In re Witness Before Special Grand Jury 2000-2, 288 F.3d 289, 295 (7th Cir.2002); Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 30 (1st Cir.1996).) Otherwise the immunity would not be absolute. The Court in Gil-lock, in refusing to extend the immunity to criminal prosecutions, reasoned that the federal interest in enforcing federal criminal laws is greater than the interest in enforcing civil laws. But the Supreme Court of Illinois gives less weight to the legislative interest in immunity from civil cases than the federal rule does. One doubts therefore that the Illinois court would grant a governor absolute legislative immunity.
If this is right, we should give him no greater immunity in the name of federal common law. The Supreme Court has said that the displacement of state law by federal common law is “limited to situations where there is a ‘significant conflict between some federal policy or interest and the use of state law.’ Our cases uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision. Not only the permissibility but also the scope of the judicial displacement of state rules turns upon such a conflict.” O’Melveny & Myers v. FDIC, 512 U.S. 79, 87-88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (citations omitted). “[A] court should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards, or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand. Otherwise, we have indicated that federal courts should ‘incorporate] [state law] as the federal rule of decision,’ unless ‘application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.’ ” Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 98, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (citations omitted); see also United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); Miller v. Illinois Central R.R., 474 F.3d 951, 952-53 (7th Cir.2007); FDIC v. Braemoor Associates, 686 F.2d 550, 554 (7th Cir.1982); compare United States v. Gillock, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980).
There is no federal interest in giving the Governor of Illinois a broader immunity from suit than he would enjoy in an Illinois state court, just as there is no federal interest in enforcing the Eleventh Amendment if a state decides to waive its sovereign immunity from suit. Lapides v. Board of Regents, 535 U.S. 613, 618-20, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); Wisconsin Dep’t of Corrections v. Schacht, 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); Clark v. Barnard, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883). It is true that state officials continue to enjoy official immunity in federal suits after a state indemnifies its officials. Greenberg v. Kmetko, 922 F.2d 382, 384 *544 (7th Cir.1991); Jaworski v. Schmidt, 684 F.2d 498, 500 (7th Cir.1982); Buckles v. King County, 191 F.3d 1127, 1136 (9th Cir.1999), just as a state does not lose its Eleventh Amendment immunity from suit by having a right to be indemnified by the federal government. Regents of University of California v. Doe, 519 U.S. 425, 430-31, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Some states have decided, rather than giving their employees immunity and thus denying relief to victims of the employees’ torts, to abrogate immunity but indemnify their employees in cases in which the employees would have been immune. We have not followed suit when the state employee is sued for a federal civil rights violation, but that is because 42 U.S.C. § 1988(a) reverses in such cases the rule of Kimbell Foods of presumptive adoption of state law to furnish the content of federal common law. Section 1988(a) provides that the “jurisdiction in civil and criminal matters conferred on the district courts by the [federal civil rights law] ... shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable ...; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law,” state law shall apply. Section 1988(a) was first enacted as section 3 of the Civil Rights Act of 1866, 14 Stat. 27, and its presumption in favor of federal rules of decision was undoubtedly based on concerns about southern hostility to civil rights.
Interpretation of Jorgensen is further complicated by the fact that the suit did not seek damages from the governor. Official immunity usually just means immunity from damages suits. Pulliam v. Allen, 466 U.S. 522, 536-38, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984); Supreme Court of Virginia v. Consumers Union of United States, Inc., supra, 446 U.S. at 736-37, 100 S.Ct. 1967; 13D Charles A. Wright et al., Federal Practice and Procedure § 3573.3, pp. 605-06, 615-16 (3d ed.2008); David Achtenberg, “Immunity Under 42 U.S.C. § 1983: Interpretive Approach and the Search for the Legislative Will,” 86 Nw. U.L.Rev. 497, 516-17 (1992). But legislative immunity confers immunity from injunctive relief as well, in Illinois, Fletcher v. City of Paris, 377 Ill. 89, 35 N.E.2d 329, 332 (1941); People ex rel. Huempfner v. Benson, 294 Ill. 236, 128 N.E. 387, 388 (1920), as elsewhere. Supreme Court of Virginia v. Consumers Union of United States, Inc., supra, 446 U.S. at 731-34, 100 S.Ct. 1967; Eastland v. United States Servicemen’s Fund, 421 U.S. 491, 502-03, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).
For all these reasons, it is uncertain whether Illinois governors enjoy legislative immunity from suit — the only kind that Blagojevich is claiming. Given the delicacy of the issue and particularly the uncertain scope of the Jorgensen opinion, the prudent course for us in this case would be to certify to the Supreme Court of Illinois, pursuant to 7th Cir. R. 52 and Ill. S.Ct. R. 20, the question whether the common law of official immunity in Illinois permits a suit to go forward against a governor when the suit is based on his performing a legislative act (not limited to a veto) for a criminal purpose.
2. The Tax Injunction Act forbids federal district courts to “enjoin, suspend or restrain the assessment, levy or collection of any tax under State law,” provided that an adequate remedy is available in the state courts. 28 U.S.C. § 1341. The Act has been described by the Supreme Court as “first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.” Rosewell v. LaSalle Nat’l Bank, 450 U.S. 503, 522, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981). *545 The Court in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), had as a practical matter stripped away the states’ sovereign immunity from equitable suits; so were it not for the Tax Injunction Act “ ‘state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State’s budget, and perhaps a shift to the State of the risk of taxpayer insolvency.’ ” Rosewell v. LaSalle Nat’l Bank, supra, 450 U.S. at 527, 101 S.Ct. 1221, quoting Perez v. Ledesma, 401 U.S. 82, 128 n. 17, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (separate opinion); see also Hill v. Kemp, 478 F.3d 1236, 1246-7 (10th Cir.2007). And “it is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public.” Dows v. City of Chicago, 78 U.S. (11 Wall.) 108, 109-10, 20 L.Ed. 65 (1871). Of course enjoining a particular tax is unlikely to “derange the operations of government.” That was a bit of 1871-style hyperbole. But the Tax Injunction Act is not limited to “deranging” taxes, and the majority opinion if it stands may make the application of the Act turn on judges’ guesses concerning the importance of a particular tax to the operations of state government.
My colleagues may have difficulty taking the question of the effect of the Tax Injunction Act in this case seriously because of the corrupt origin of the casino tax and a certain risible element in the idea of taxing one gambling business to subsidize another (the “derangement” question). But the corrupt origin of the tax is irrelevant. The Act would be thwarted if a taxpayer could get a federal court to enjoin a tax case just by presenting evidence of corruption in the process by which the taxing statute had been enacted. This has been recognized in analogous contexts, see, e.g., City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 374-78, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (state immunity from federal antitrust suits) — notably that of absolute immunity, Pierson v. Ray, 386 U.S. 547, 553-54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), as I pointed out in discussing the federal (but maybe not the Illinois) rule on legislative immunity.
Gambling taxes are not unusual; casino taxes may be, but they are certainly not unique. See Ind.Code §§ 4-33-12-1, - 6(b)(6); N.J. Stat. §§ 5:12-203(a), -205; cf. Md.Code, State Gov’t, §§ 9-lA-27(a)(5), - 29. They are real taxes, not service fees. The fact that the revenue from a particular tax is earmarked for a particular purpose is hardly unusual; think of the social security tax. Horse racing, the beneficiary of the casino tax, is a major activity in Illinois and one with considerable economic significance for the state. It employs more than 30,000 people and generates more than $700 million in annual betting and some $16 million in state and local government revenues. Ill. Pub. Act 94-804, § l(3)-(4); Illinois Racing Board, “2009 Annual Report” 2, 6 (Mar.2010), www.state.il.us/ agency/irb/racing/reports/2009_Annual_ Reportpdf (visited Feb. 15, 2011); Commission on Government Forecasting and Accountability, “Wagering in Illinois — 2009 Update” 51-57 (2010), www.ilga.gov/ commission/cgfa2006/Upload/2009 wagering_in_il.pdf (visited Feb. 15, 2011). *546 And that’s just the beginning, because horse racing boosts the horse population of Illinois, which benefits breeders, horse farms, feed companies, and other commercial activities ancillary to horse racing. Bill Wright, “Where Illinois’ Economy Gets Its Horsepower,” Chicago Tribune, Mar. 10, 2002, p. 6. Governments routinely subsidize favored activities — not by taxing the persons or firms engaged in the activities, which would negate the subsidy, but by taxing someone else.
Casinos are recent additions to the legal gambling scene in Illinois; the first casino in the state opened in 1991. Jerry Shnay, “Alton Riverboat Already Hitting Jackpot,” Chicago Tribune, Sept. 25, 1991, at 4. They compete with the racetracks and thus attract gamblers away from them. So at least it is widely believed, see Illinois Harness Horsemen’s Ass’n, Press Release, “Top State Horsemen Flee to Greener Pastures in Eastern States” (Nov. 30, 2005), and William Nack, “A House Divided,” Sports Illustrated, July 10, 1995, at 52, 56, though Douglas M. Walker and John D. Jackson, in their article “Do U.S. Gambling Industries Cannibalize Each Other?,” 36. Public Finance Rev. 308, 322-24 (2008), present contrary evidence— evidence that casino and other non-racetrack gambling increases the demand for racetrack gambling by increasing the demand for gambling in general. What is not debatable is that, whether because of the advent of casinos or because of other factors, racetrack attendance and revenues in Illinois have plummeted in recent years, along with the state’s horse population and the commercial activities that are correlated with the number of horses. Illinois Racing Board, supra, at 9; Commission on Government Forecasting and Accountability, supra, at 56-57; Will Buss, “Hoffman: Bill Will Help Fairmount,” Belleville News-Democrat, Mar. 27, 2008, p. Al. The first of these sources shows horse-racing bets falling from $1.2 billion in 1996 to $700 million in 2009, though some of the drop is doubtless attributable to the miserable economic situation in 2009, for the 2007 total was $900 million.
In a laissez-faire or Social Darwinist society, government would keep its hands off the competition between the casinos and the racetracks. The disappearance of racetracks, jockeys, horses, bridles, blacksmiths, racetrack touts, and DVDs of “National Velvet” — replaced by croupiers, glassy-eyed retirees at one-armed bandits, roulette wheels, and blackjack tables, all on riverboat casinos — would be commended as progress. But American government is not committed to the laissez-faire vision of society. Congress and state legislatures are constantly using their taxing and spending and regulatory powers to redistribute wealth from one group in society to another. This may be good or bad, but it is routine and constitutional. Federal payroll taxes are earmarked for such programs as Medicare, social security, and unemployment benefits; the federal gasoline tax is used to subsidize highway construction; other earmarked taxes (taxes the revenues from which are specified for a particular use) are common. See Susan-nah Camic, “Earmarking: The Potential Benefits,” 4 Pitt. Tax Rev. 55, 60-61 (2006). Rarely are the taxpayers closely matched with the recipients of the spending that the taxes support. The levying of taxes on a particular industry for the sole benefit of another industry is somewhat uncommon but certainly not unknown. For example, the federal Audio Home Recording Act of 1992 taxes digital media to subsidize prerecorded media, 17 U.S.C. § 1001 et seq.; the Illinois Coal Technology Development Assistance Fund taxes gas and electrical utilities to pay for the development of coal technologies, 30 ILCS 730/3; and Ohio taxes wine from all over *547 the world to pay for research on grapes in Ohio. Ohio Rev.Code Ann. §§ 924.51 et seq., 4301.43(B).
An excise tax on casinos is a tax, and where the tax money goes is irrelevant to the applicability of the Tax Injunction Act. Suppose the revenues from the casino tax were earmarked for cosmetic surgery for members of the Illinois legislature. Would anyone doubt that the casino tax was still a tax? Would it matter that the tax revenues were disbursed to the intended recipients of the subsidy funded by those revenues within 10 days of receipt? I think not, and yet the racetrack subsidy is less absurd than my hypothetical example. Sixty percent of the subsidy is earmarked for the purses for winners and runners-up in horse races on the theory that bigger purses attract the owners of the better horses and the better the horses in a race the larger the attendance and therefore the more money is bet on the race and so the greater are the track’s revenues because they’re a percentage of the amount of money that is bet. The other 40 percent of the revenue from the casino tax is to be used for physical improvements of the racetracks. The subsidy is rationally designed to promote the horse racing industry in Illinois, which seems no less proper an objective than promoting a state’s film industry by offering tax credits to filmmakers, a common form of state subsidy. Horse racing and movies are two forms of entertainment.
What is true is that not every state receipt is the fruit of a tax. Fees for services are not deemed taxes for purposes of the Tax Injunction Act. We have explained the difference as follows: “If the fee is a reasonable estimate of the cost imposed by the person required to pay the fee, then it is a user fee and is within the municipality’s regulatory power. If it is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits, it is a tax, whatever its nominal designation.” Diginet, Inc. v. Western Union ATS, Inc., 958 F.2d 1388, 1399 (7th Cir.1992). For examples of exactions held to be fees rather than taxes for purposes of the Tax Injunction Act, see Hager v. City of West Peoria, 84 F.3d 865, 870-71 (7th Cir.1996) (fees for permits for use of certain streets by heavy trucks); Government Suppliers Consolidating Services, Inc. v. Bayh, 975 F.2d 1267, 1271 n. 2 (7th Cir.1992) (registration fees for waste-collection vehicles), and Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 4-6 (1st Cir.1992) (annual fee imposed on owners of motor vehicles to fund compulsory accident compensation). For examples of exactions held to be taxes for purposes of the Act, see Hill v. Kemp, supra, 478 F.3d at 1243-46 (costs of specialty license plates; revenue in excess of administrative costs go to general fund and elsewhere); Folio v. City of Clarksburg, 134 F.3d 1211, 1217 (4th Cir.1998) (city fee for fire protection); Wright v. McClain, 835 F.2d 143, 145 (6th Cir.1987) (parolee’s payments to a victim compensation fund); and cf. Diginet, Inc. v. Western Union ATS, Inc., supra, 958 F.2d at 1399 (“franchise fee” imposed on use of a fiber optic network to generate revenues that are “use[d] to offset unrelated costs or confer unrelated benefits”).
A potential source of confusion is that “courts faced with distinguishing a ‘tax’ from a ‘fee’ ‘have tended ... to emphasize the revenue’s ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency’s cost of regulation.’ ” Hager v. City of West Peoria, supra, 84 F.3d at 870. The reference to “narrow benefits” may *548 seem to describe this case, since only racetracks received the proceeds of the casino tax. But this is to ignore the words in the Hager opinion that follow “provides more narrow benefits”: “to regulated companies or defrays the agency’s cost of regulation.” A fee matches revenue to cost: a doctor’s fee pays for his service. The tax on the casinos does not go to pay for some service that the State of Illinois renders to casinos; it goes to subsidize racetracks, and so it falls within the rule that exactions of money earmarked for designated purposes rather than just collected to swell the state’s coffers are taxes within the meaning of the Tax Injunction Act whether or not they are levied for a purpose of which judges approve. Schneider Transport, Inc. v. Cattanach, 657 F.2d 128, 132 (7th Cir.1981) (registration fee held to be a tax even though the tax revenues were deposited in a segregated fund, the state transportation fund, earmarked for state highway construction); Valero Terrestrial Corp. v. Caffrey, 205 F.3d 130, 135 (4th Cir.2000) (solid waste disposal assessment fee held to be a tax even though the revenues were earmarked for environmental clean up); Wright v. McClain, supra, 835 F.2d at 145 (charges earmarked for corrections held to be a tax). The majority opinion in the present case invokes Bidart Brothers v. California Apple Comm’n, 73 F.3d 925 (9th Cir.1996), but that case involved an assessment of fees on apple producers to support advertising and other activities designed to boost apple consumption. The fees were to pay for services to the payors of the fees. Taxes are levied on people or firms who may derive no benefit at all from them, as in the present case. Workers who die before reaching the age of eligibility for social security receive no social security benefits, though they may have paid many thousands of dollars in social security taxes.
The practical reason for the difference in treatment under the Tax Injunction Act between fees and taxes is that enjoining the collection of a fee is less likely to disrupt state programs than enjoining a tax. Fees are for services and if the collection of the fees is enjoined, the state can curtail the services. Cf. Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1383 (8th Cir.1997); San Juan Cellular Telephone Co. v. Public Service Comm’n of Puerto Rico, 967 F.2d 683, 686-87 (1st Cir.1992). But if the use of tax moneys to subsidize racetracks is enjoined, the subsidy program is halted until the injunction is lifted — unless the rule is to be that an earmarked tax, held to be enjoinable, can be replaced by a tax having a broader base. This would inject the federal courts deeply into the design of injunction-proof state taxes.
It is true that the plaintiffs are not seeking to enjoin the casino tax in the narrow sense of “enjoin”; the money has been collected and paid to the racetracks or placed in a separate fund that if the casinos lose this case will also be paid to the racetracks. But a constructive trust, just like an injunction, is an equitable remedy. Bontkowski v. Smith, 305 F.3d 757, 761 (7th Cir.2002); Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, 380 (1919) (Cardozo, J.); 1 Dan B. Dobbs, Law of Remedies § 4.3(2), pp. 589-90 (2d ed.1993). If allowed in cases in which an injunction would be unlawful, it would defeat the purpose of the Tax Injunction Act. So the Second Circuit held in the name of the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a) — the counterpart, in federal taxation, to the Tax Injunction Act — with regard to the imposition of a constructive trust on moneys that would otherwise have been used to satisfy federal tax liabilities. SEC v. Credit Bancorp, Ltd., 297 F.3d 127, 137-38 (2d Cir.2002).
*549 Other forms of equitable relief have been held to be forbidden by the Tax Injunction Act when, even though no equitable relief was sought against the state itself, the relief sought would have indirectly but substantially interfered with tax collection by the state. In Sipe v. Amerada Hess Corp., 689 F.2d 396, 403-04 (3d Cir.1982), for example, the plaintiffs sought to enjoin their employers from deducting unemployment taxes from their paychecks. And in RTC Commercial Assets Trust 1995-NPS-1 v. Phoenix Bond & Indemnity Co., 169 F.3d 448, 454-56 (7th Cir.1999), the plaintiff sought a declaration that a tax certificate that the private defendant had purchased at a tax sale was invalid. In both cases the plaintiffs lost. See also Blangeres v. Burlington Northern, Inc., 872 F.2d 327, 328 (9th Cir.1989) (per curiam); cf. California v. Grace Brethren Church, 457 U.S. 393, 407-11, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982); Wright v. Pappas, 256 F.3d 635 (7th Cir. 2001).
But even though, if I’m right, this suit is a challenge to a state tax, the Tax Injunction Act is a bar only if there is available to the plaintiffs a state remedy that is “plain, speedy and efficient.” 28 U.S.C. § 1341; see, e.g., Rosewell v. LaSalle Nat’l Bank, supra, 450 U.S. at 512-15, 101 S.Ct. 1221. There is. The casinos can ask an Illinois state court to impose a constructive trust on the tax receipts. See Village of Itasca v. Village of Lisle, 352 Ill.App.3d 847, 288 Ill.Dec. 35, 817 N.E.2d 160, 170 (2004); Selmaville Community Consolidated School Dist. No. 10 v. Salem Elementary School Dist. No. 111, 96 Ill. App.3d 1062, 52 Ill.Dec. 224, 421 N.E.2d 1087, 1091 (1981). Whether they can seek a refund of the taxes they paid is less clear, because it is unclear whether the refund statute cited by the parties — the State Officers and Employees Money Disposition Act, 30 ILCS 230/2a, which was the statutory basis for the casinos’ claims in a previous state court action, Empress Casino Joliet Corp. v. Giannoulias, 231 Ill.2d 62, 324 Ill.Dec. 491, 896 N.E.2d 277, 283 (2008) — authorizes the recovery of tax money that has already been disbursed. If the unlawfulness can be traced to the racetracks, the casinos can seek damages from them (as they are trying to do with respect to the two racetracks that it charges with having violated the RICO statute). What the casinos cannot be permitted to do is to freeze the state’s tax moneys by imposition of a constructive trust on them.
To summarize my position, the question whether Blagojevich is entitled to absolute immunity from a civil suit challenging his legislative acts while governor should be certified to the Supreme Court of Illinois; the district court’s ruling that the plaintiffs’ constructive trust claim is barred by the Tax Injunction Act should be affirmed.