In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-3975 & 10-1019

EMPRESS CASINO JOLIET CORPORATION,
an Illinois corporation, et al.,

*Plaintiffs-Appellants (No. 09-3975)*
*Plaintiffs-Appellees (No. 10-1019),*

*v.*

ROD R. BLAGOJEVICH,

*Defendant-Appellant (No. 10-1019),*

and

BALMORAL RACING CLUB, INC.,
MAYWOOD PARK TROTTING ASSOCIATION,
INC., ARLINGTON PARK RACECOURSE, LLC,
FAIRMOUNT PARK, INC., and
HAWTHORNE RACE COURSE, INC.,

*Defendants-Appellees (No. 09-3975).*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-03585—**Matthew F. Kennelly**, *Judge.*

ARGUED FEBRUARY 23, 2010—DECIDED MARCH 2, 2011

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This civil racketeering suit has some factual overlap with the federal prosecution of former Illinois Governor Rod Blagojevich, now awaiting retrial on various criminal counts that were tried last summer but resulted in a hung jury. Four riverboat casinos claim they are victims of a pay-to-play scheme engineered by Blagojevich and John Johnston, the owner of two Illinois horse-racing tracks.[1] The casinos allege that Blagojevich "sold" and Johnston "bought" the enactment of two Illinois gaming laws requiring them to pay 3% of their adjusted gross revenue into a "Horse Racing Equity Trust Fund" as a condition of their gaming licenses. The proceeds of this fund go not to the State of Illinois or to any state program or service but instead are paid directly to a small group of competing gambling enterprises: five Illinois horse-racing tracks, including the two owned by Johnston.[2] The details of this scheme are largely derived from the federal criminal

---

[1] Operating in various locations in Illinois, the riverboat casinos are: Empress Casino Joliet Corporation; Des Plaines Development LP (doing business as Harrah's Casino Cruises Joliet); Hollywood Casino-Aurora, Inc.; and Elgin Riverboat Resort-Riverboat Casino (doing business as Grand Victoria Casino). We refer to them collectively as "the casinos."

[2] Johnston's horse-racing tracks are Balmoral Racing Club, Inc., and Maywood Park Trotting Association, Inc.; the others are Arlington Park Racecourse LLC; Fairmount Park, Inc.; and Hawthorne Race Course, Inc. We refer to them collectively as "the racetracks" unless the context requires otherwise.

complaint that led to Blagojevich's removal from office in January 2009 and an indictment later returned against him. While this case has been pending, the casinos have continued to pay into the fund (more than $100 million and counting), but the money is frozen on release and held in escrow under the terms of a temporary restraining order put in place by the district court.

The casinos' complaint has two counts: (1) a RICO-conspiracy claim against Blagojevich, his campaign committee "Friends of Blagojevich," Johnston, and the two racetracks he owns; and (2) a constructive-trust claim against all five racetracks as beneficiaries of the ill-gotten gains of the conspiracy.[3] The defendants moved to dismiss on multiple grounds, and the casinos sought a preliminary injunction to maintain the escrow. Each side prevailed in part. The district court left the RICO claim standing and also rejected Blagojevich's claim of legislative immunity. But the court accepted the racetracks' argument that the casino surcharge is a tax and therefore the Tax Injunction Act, 28 U.S.C. § 1341, blocked the court's jurisdiction to impose a constructive trust. The court then dismissed the constructive-trust claim, denied the motion for a preliminary injunction, and dissolved the TRO. Blagojevich sought immediate review of the immunity issue; the casinos appealed the

---

[3] Count I alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), (d). Count II seeks a common-law constructive trust over the proceeds of the RICO conspiracy alleged in Count I.

denial of a preliminary injunction, which also brought up the jurisdictional dismissal of their constructive-trust claim. We reinstated the TRO pending resolution of the appeals.

We now reverse. The former governor is entitled to legislative immunity. The Supreme Court has made clear that state and local officials are absolutely immune from federal suits filed against them in their personal capacities for actions taken in connection with legitimate legislative activity. This immunity applies notwithstanding allegations of misconduct and regardless of whether the office held is legislative or executive—as long as the *activity* in question is functionally legislative. Under this established federal doctrine, Blagojevich is immune from civil suit for his role in inducing the Illinois legislature to adopt the Horse Racing Acts of 2006 and 2008 and for signing those Acts into law. The RICO claim survives, however; Friends of Blagojevich, Johnston, and the two racetracks he owns remain as defendants on that claim.

The Tax Injunction Act does not bar the court from imposing a constructive trust on the money disbursed from the Horse Racing Fund. The casino surcharge is not a tax. It raises no revenue for the operation of state government and supports no governmental agency, program, or service. It simply takes profits from a few private firms for direct transfer to certain favored, apparently less-profitable competitors. The money is held in a segregated account, may not be used to pay any state expense, and is disbursed within a few days to the

beneficiary racetracks. Assessed as a condition of state licensure, the surcharge is more like a regulatory penalty or fee than a tax, and therefore the Tax Injunction Act does not apply. We also reject the racetracks' alternative arguments—preclusion, abstention, and failure to state a claim—offered in support of affirmance. The TRO remains in effect.

## I. Background

On May 26, 2006, Governor Blagojevich signed a most unusual bill into law. The 2006 Horse Racing Act, Illinois Public Act 94-804, targeted the state's four highest-earning riverboat casinos and compelled them to pay 3% of their adjusted gross revenue into a segregated fund, the "Horse Racing Equity Trust Fund," for a period of two years. 230 ILL. COMP. STAT. 10/7(a). The money deposited into the Fund—a "non-appropriated trust fund held separate and apart from State moneys"—is disbursed directly to five Illinois horse-racing tracks, the defendants here, within ten days of deposit. *Id*. § 5/54.5(a), (b). The money held in the Fund may not be transferred to the State's general revenue fund or otherwise commingled with public funds and may not be allocated to any state agency or program or used to pay any state cost or expense. The racetracks must spend 60% of the money they receive from the Fund on the "purse"—a cash prize awarded to the owners of top-finishing horses—and the remaining 40% on operational expenses. *Id.* The racetracks are also required to provide the Illinois Racing Board with a detailed account of money received and spent from the Fund.

The Illinois General Assembly made several legislative findings in connection with the 2006 Racing Act. It noted that from 1992—the first year riverboat casinos began operating in Illinois—through 2005, on-track horse wagering in Illinois decreased by 46%. This decline would be reversed, the legislature found, if funds generated by the 2006 Racing Act were paid directly to the horse-racing tracks. Helping the horse-racing industry, in turn, would have important downstream benefits for Illinois farmers, breeders, and horse-racing fans. After the 2006 Act expired, the legislature enacted the 2008 Horse Racing Act, Illinois Public Act 95-1008, which effectively extended the 2006 Act for another three years, through December 2011.

The enactment of the 2006 Racing Act set in motion an extraordinary confluence of events, legal and political. The history is lengthy and complex but important to some of the issues raised on appeal, so we cannot skip over it. Four days after passage of the 2006 Act, the casinos filed suit in Will County Circuit Court challenging the Act's constitutionality. They named the Illinois Treasurer and the Illinois Racing Board as defendants and sued under the "Protest Monies Act," 30 ILL. COMP. STAT. 230/2a (formally the State Officers and Employees Money Disposition Act), which allows taxpayers to challenge state laws and pay the contested monies into a protest fund until the action is resolved. They claimed that the 2006 Racing Act violated several provisions of the Illinois Constitution, including its takings, due-process, uniformity, and public-purpose clauses, as well as the Takings Clause of the Fifth Amendment. The trial

court entered summary judgment for the casinos, and the state defendants took a direct appeal to the Illinois Supreme Court. On June 5, 2008, the state supreme court reversed, upholding the 2006 Act against the casinos' state and federal constitutional challenges.[4] *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277 (Ill. 2008).

Six months later, on December 7, 2008, the United States Attorney for the Northern District of Illinois filed a criminal complaint against Blagojevich accusing the governor of engaging in a "political corruption crime spree." In an affidavit filed with the complaint, an FBI agent recounted the contents of intercepted phone conversations in which Blagojevich discussed (as relevant here) soliciting payments as a quid pro quo for signing the 2006 Racing Act. The Illinois House of Representatives immediately convened a special investigative committee to investigate Blagojevich's alleged malfeasance and determine whether he should be impeached. The com-

---

[4] The Illinois Supreme Court held that the 2006 Racing Act did not arbitrarily or unreasonably single out the casinos in violation of the state constitution's uniformity clause. *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 284-87 (Ill. 2008). The court also held that state and federal takings analysis applies only to uses of the state's power of eminent domain, and on this basis rejected the takings claims. *Id.* at 290-93. Finally, the court rejected the casinos' argument that the 2006 Act violated the state constitution's public-purpose clause because its primary beneficiaries were private parties; the court deferred to the legislative findings regarding the public benefits of the Act. *Id.* at 293-96.

mittee's final report recommended impeachment based in part on Blagojevich's arrangement with Johnston for political contributions in exchange for his signature on the 2006 Act. The Illinois House quickly voted to impeach Blagojevich, and the Senate removed him from office on January 30, 2009. On April 2, 2009, the U.S. Attorney filed a superseding indictment charging Blagojevich with 17 crimes, including wire fraud, attempted extortion, bribery conspiracy, and racketeering. A 24-count second superseding indictment was filed on February 4, 2010.

In the meantime, in January 2009 the casinos filed a petition for certiorari in the United States Supreme Court seeking review of the Illinois Supreme Court's decision rejecting their claim that the 2006 Racing Act violated the Takings Clause of the federal constitution. On June 8, 2009, the Supreme Court denied certiorari. *Empress Casino Joliet Corp. v. Giannoulias*, 129 S. Ct. 2764 (2009).

Two days later, the casinos filed a petition in Will County Circuit Court for relief from judgment under 735 ILL. COMP. STAT. 5/2-1401. The petition was based on the newly disclosed information from the FBI's investigation of Blagojevich. The casinos told the court the new evidence would show that the legislative findings in the 2006 Racing Act—on which the Illinois Supreme Court had so heavily relied—were basically a sham. The 2006 Act, they maintained, was the product of a "corrupt bargain" between Blagojevich and Johnston and therefore violated the due-process clause of the

Illinois Constitution. In support of their petition, the casinos later submitted the FBI agent's affidavit, wiretap transcripts, the April 2009 superseding indictment, and the report of the legislature's special investigative committee recommending impeachment.

This effort to reopen the constitutional challenge failed; on August 17, 2009, the trial judge denied the casinos' petition. The judge said the legislature's motive in passing the 2006 Racing Act was irrelevant to the Act's constitutionality. She specifically declined to consider the FBI agent's affidavit, the wiretap transcripts, or the superseding indictment, saying these items were inadmissible hearsay, did not contain "facts which have been proved," and involved a different case and different parties. (The judge did, however, take judicial notice of the special investigative committee's final report.) The judge then ordered the Illinois Treasurer to transfer the money deposited under the 2006 Act from the protest fund to the Horse Racing Fund, setting up the imminent disbursement of the money to the racetracks. The casinos appealed and asked the trial court for a stay. This request was denied, and the Illinois Appellate Court also refused to grant a stay. On January 15, 2010, the casinos voluntarily dismissed this appeal.

While these constitutional challenges to the 2006 Act were winding their way through the courts, the casinos commenced a second suit in Will County against the Illinois Treasurer and the Illinois Racing Board challenging the constitutionality of the 2008 Racing Act. Filed on January 8, 2009, their complaint alleged that the 2008

Act was the product of a pay-to-play scheme and violated various provisions of the Illinois Constitution. Relying exclusively on the earlier denial of the casinos' § 2-1401 petition for postjudgment relief in the case challenging the 2006 Act, the Will County court dismissed the new suit with prejudice on November 19, 2009. At the time of this ruling, all the racetracks except Fairmount had intervened as defendants. The casinos appealed, and the Illinois Appellate Court denied their motion for a stay. On February 11, 2011, the appellate court affirmed.

We now arrive at this case. On June 12, 2009, two days after filing their motion for postjudgment relief in the first of the state-court cases, the casinos filed this action in the Northern District of Illinois—the first to assert claims directly against Blagojevich, Johnston, and the racetracks. As we have noted, it has two counts: (1) a RICO-conspiracy claim against Blagojevich, Friends of Blagojevich, Johnston, Balmoral, and Maywood; and (2) a state-law claim against all five racetracks seeking a constructive trust to prevent their unjust enrichment from the proceeds of the racketeering scheme.

A few weeks after this action was filed, the casinos commenced yet another state-court suit, this time in Cook County Circuit Court, seeking injunctive relief against the Illinois Treasurer to prevent the imminent transfer of the money from the protest fund to the Horse Racing Fund and then to the racetracks. The court dismissed this action. The casinos appealed, but later dismissed the appeal and instead sought a TRO and preliminary injunction from the district court in this case.

They asked that any money disbursed from the Horse Racing Fund be held in an interest-bearing special escrow account pending resolution of the federal suit. The district court entered a TRO to that effect and scheduled a hearing on the request for a preliminary injunction.

The defendants opposed the preliminary injunction and moved to dismiss on several legal theories. Blagojevich asserted legislative immunity, and he and his campaign committee also argued the suit was barred by res judicata and failed to adequately state a RICO claim. The other defendants on the RICO claim—Johnston, Balmoral, and Maywood—joined the latter two arguments and also maintained that the casinos could not prove a pattern of racketeering activity or proximate causation. On the constructive-trust claim, the racetracks (all of them) asserted multiple defenses: (1) the casino surcharge was a tax and therefore the Tax Injunction Act stripped the court of subject-matter jurisdiction; (2) the action was premature because they had not yet received disbursement of money under the Racing Acts; (3) as a matter of law, they were not "unjustly enriched" by the payment of money under Acts; and (4) the action was barred by res judicata, or in the alternative, the court should abstain under the *Colorado River* doctrine.

The district court denied the motion to dismiss the RICO count and also rejected Blagojevich's claim of legislative immunity. On the constructive-trust claim, the judge agreed with the racetracks' argument that the casino surcharge was a tax and therefore the Tax Injunction Act eliminated the court's jurisdiction. The

judge acknowledged, however, that "the question is not free from doubt." The judge then dismissed the constructive-trust claim, denied the motion for a preliminary injunction, and dissolved the TRO. Blagojevich appealed the denial of legislative immunity, and the casinos appealed the denial of their motion for a preliminary injunction, which was premised on the jurisdictional dismissal of the constructive-trust claim. The racetracks responded to the casinos' appeal, defending the district court's decision to dismiss under the Tax Injunction Act and also reiterating their alternative arguments for dismissal of the constructive-trust claim.[5] Friends of Blagojevich and Johnston are not parties to either appeal. We consolidated the appeals for decision and reinstated the TRO.

In August 2010, after a two-month trial and 14 days of deliberations, a federal jury convicted Blagojevich on one criminal count—making false statements to the FBI—but could not reach a verdict on the other 23. He awaits retrial, currently scheduled for April.

---

[5] Arlington Park, Fairmount Park, and Hawthorne appear jointly on appeal. Balmoral and Maywood, the two racetracks owned by Johnston, appear together but separately from the other three racetracks. We will continue to refer to them collectively as "the racetracks" unless the context requires otherwise.

## II. Discussion

### A. Blagojevich's Claim of Legislative Immunity

We begin with the question raised in Blagojevich's appeal: Does legislative immunity shield the former governor from this suit? The district court answered "no" and denied his motion to dismiss. A decision denying a claim of immunity is immediately appealable under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 524-25 (1985). Whether Blagojevich is entitled to legislative immunity is a question of law that we review de novo. *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008).

The doctrine of legislative immunity is well-established by Supreme Court and circuit precedent; state and local officials are absolutely immune from federal suit for personal damages for their legitimate legislative activities. *See Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998); *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731-34 (1980); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 403-04 (1979); *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *Biblia Abierta v. Banks*, 129 F.3d 899, 906 (7th Cir. 1997); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 729 F.2d 1128, 1130-31 (7th Cir. 1984). Sixty years ago the Supreme Court explained the contours of this common-law immunity in *Tenney v. Brandhove*, 341 U.S. at 377. *Tenney* holds that state officials are absolutely immune from civil liability for activities undertaken in "the sphere of legitimate legislative activity." *Id.* at 376-77 ("Legislators are immune from deterrents to the uninhibited discharge

of their legislative duty, not for their private indulgence but for the public good."). *Tenney* did not create a new strain of immunity doctrine; instead, the Court held that Congress in passing the Civil Rights Act of 1871, the predecessor to 42 U.S.C. § 1983, had not abrogated preexisting common-law legislative immunity for state officials. *Id.* at 372; *see also Lake Country Estates,* 440 U.S. at 403 ("The immunity of legislators from civil suit for what they do or say as legislators has its roots in the parliamentary struggles of 16th- and 17th-century England; such immunity was consistently recognized in the common law and was taken as a matter of course by our Nation's founders.").

Cases decided since *Tenney* have made clear that this immunity extends to all state and local officials, including those outside the legislative branch, for the performance of acts that are legislative in character or function. *See Bogan,* 523 U.S. at 55 (extending legislative immunity to a mayor for signing an ordinance into law); *Consumers Union,* 446 U.S. at 731-34 (extending legislative immunity to claims for injunctive and declaratory relief brought against judges for promulgating a code of professional responsibility); *Lake Country Estates,* 440 U.S. at 404-05 (extending legislative immunity to members of an interstate planning commission for enacting a regional land-use ordinance). This functional approach to legislative immunity is consistent with the normal method for determining the availability and scope of common-law immunities. *See Forrester v. White,* 484 U.S. 219, 224 (1988) ("Running through our cases, with fair consistency, is a 'functional' approach to immunity ques-

tions other than those that have been decided by express constitutional or statutory enactment."); *see also Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) (noting functional approach to legislative immunity).

Although the Supreme Court has not specifically addressed a legislative-immunity claim by a governor, there is no principled reason to think the established doctrine applies any differently to governors who are sued for their role in legislative activity. Our circuit has suggested, albeit in dicta, that governors are entitled to legislative immunity against claims for injunctive relief as well as damages suits when the conduct at issue relates to the legislative process. *See Risser v. Thompson*, 930 F.2d 549, 551 (7th Cir. 1991) ("When the governor of a state is exercising his veto power, he is acting in a legislative capacity, . . . and he is therefore entitled to absolute immunity." (citing *Tenney* and *Consumers Union*)). Other circuits have not hesitated to extend legislative immunity to governors for their legislative acts. *See State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 91-92 (2d Cir. 2007) (confirming availability of legislative immunity for governor, but denying it on the ground that additional discovery was necessary to determine whether the acts in question were legislative); *Baraka v. McGreevey*, 481 F.3d 187, 196-97 (3d Cir. 2007) (absolute legislative immunity for governor advocating passage of legislation and signing bill into law); *Torres-Rivera v. Calderón-Serra*, 412 F.3d 205, 212-14 (1st Cir. 2005) (governor entitled to legislative immunity for signing legislation); *Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003) (same).

*Tenney* also established that legislative immunity applies even when the official is accused of misconduct or other improper motive. 341 U.S. at 376-77 ("The claim of an unworthy purpose does not destroy the privilege."); *see also Bogan,* 523 U.S. at 54 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); *Biblia Abierta*, 129 F.3d at 903. Accordingly, *Tenney*'s use of the phrase "legitimate legislative activity" must be understood as a reference to the governmental sphere in which the official was operating, not the legality or propriety of his acts. *Tenney,* 341 U.S. at 376. Legislative immunity would have "little value," the Court has explained, if forced to give way in the face of allegations of official misconduct. *Id.* at 377. Based on this principle, we have extended legislative immunity to state officials despite allegations of bribery and improper influence. *See Thillens*, 729 F.2d at 1130 (state legislators are entitled to legislative immunity in spite of bribery allegations). Even when the plaintiff's claim is directed primarily at illegal conduct by public officials, immunity attaches if the claim requires "'proof of a legislative act or the motives or purposes underlying such an act.'" *Id.* at 1131 (quoting *Gravel v. United States*, 408 U.S. 606, 621 (1972)); *see also Chappell v. Robbins*, 73 F.3d 918, 920, 925 (9th Cir. 1996) (defendant who *admitted* that he took bribes in exchange for legislation was protected by legislative immunity in civil RICO action).

Under this long-standing doctrine, Blagojevich is entitled to immunity from this civil RICO suit. The allegations are that the former governor took bribes in

exchange for influencing the state legislature to pass the Racing Acts and for signing the Acts into law. Or in the casinos' own formulation, Johnston "bought" and Blagojevich "sold" the Racing Acts. The casinos' claim cannot be made without reference to the former governor's role in securing the enactment of these Acts. *See Chappell*, 73 F.3d at 922; *Thillens*, 729 F.2d at 1131. The activity in question—influencing the state legislature to pass the bills and signing them into law—is unquestionably legislative in character. *See Bogan*, 523 U.S. at 55 (signing a bill into law is a legislative function protected by immunity); *Thillens*, 729 F.2d at 1131 (influencing the legislative process is a legitimate legislative activity). Because the RICO claim "broadly implicate[s]" Blagojevich's role in the legislative process, he is protected by absolute legislative immunity. *Thillens*, 729 F.2d at 1131.

The casinos weakly suggest that legislative immunity is somehow limited to § 1983 suits and does not apply to claims under RICO. This is a nonstarter. We held long ago that legislative immunity applies in a RICO suit. *See id.* at 1129 (holding that legislative immunity bars a civil RICO suit as well as claims under § 1983, the Sherman Antitrust Act, and various state-law torts). As we have already noted, *Tenney* did not create a new immunity applicable only to § 1983; rather, it held that Congress did not abrogate common-law legislative immunity when it enacted the Civil Rights Act of 1871. 341 U.S. at 372-77. The Supreme Court has always defined legislative immunity broadly as "absolute immunity from *federal damages liability*," without reference to any specific cause of action. *Lake Country Estates*, 440 U.S. at

406 (emphasis added). And like § 1983, there is nothing in RICO to demonstrate the "clear legislative intent" required to abrogate common-law immunity. *See Pulliam v. Allen*, 466 U.S. 522, 529 (1984) (holding that clear legislative intent is required to abrogate common-law principles of legislative and judicial immunity); *see also Chappell*, 73 F.3d at 923-24 (concluding that nothing in RICO's text or legislative history evinces an intent to abrogate common-law legislative immunity).

These principles of federal law are so clear that the casinos focus most of their attention on a wholly different point—that *state* immunity law applies. This is the argument that persuaded the district court. The casinos insist that the Illinois Supreme Court's decision in *Jorgensen v. Blagojevich*, 811 N.E.2d 652 (Ill. 2004), which denied then-Governor Blagojevich legislative immunity under the Illinois Constitution, must control this case. Not so. It is blackletter law that "[t]he elements of, and the defenses to, a federal cause of action are defined by federal law." *Howlett v. Rose*, 496 U.S. 356, 375 (1990); *see also Owen v. City of Independence*, 445 U.S. 622, 647 n.30 (1980) ("Municipal defenses—including an assertion of sovereign immunity—to a federal right of action are, of course, controlled by federal law."). Indeed, the Supreme Court has expressly rejected the position that a state constitution or other state law should have any effect on federal common-law legislative immunity. *See Lake Country Estates*, 440 U.S. at 404-05 ("[T]he absolute immunity for state legislators recognized in *Tenney* reflected the Court's interpretation of federal law; the decision did not depend on the presence of a speech or debate

clause in the constitution of any State, or on any particular set of state rules or procedures available to discipline erring legislators.").

There is good reason to preserve the content and scope of federal immunity doctrine from state encroachment. Were it otherwise, states could strip their officials of immunity in federal court or immunize them for federal constitutional or statutory violations, frustrating the operation and uniformity of federal law. Then-Judge Stevens made this point explicit in an opinion for this court more than thirty years ago:

> Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.

*Hampton v. City of Chicago*, 484 F.2d 602, 607 (7th Cir. 1973). The suggestion that *state* immunity law displaces an otherwise valid claim of federal immunity is a bit odd, or at least unworkable; for the reasons noted in *Hampton*, the scope of a public official's immunity from suit on a federal claim in federal court is a matter of *federal* law.

Moreover, some states have little or no developed jurisprudence in this area. Indeed, the law often runs in the opposite direction. State courts have imported federal common-law immunity doctrine into actions arising under state law. *See, e.g., Camacho v. Samaniego*,

954 S.W.2d 811, 823 (Tex. Ct. App. 1997) ("Because the jurisprudence of legislative immunity is not well developed in Texas, we will rely on federal authorities to assess the applicability of this form of immunity to the case before us."); *see also Brown v. City of Bordentown*, 791 A.2d 1007, 1010 (N.J. Super. Ct. App. Div. 2002) (adopting federal common-law legislative immunity in state-law action); *Dublin v. State*, 742 N.E.2d 232, 236-37 (Ohio Ct. App. 2000) (looking to federal cases to define legislative immunity).

We also reject application of *Jorgensen* on its own terms. *Jorgensen* did *not* involve a question of legislative immunity from a personal-damages suit. To the contrary, *Jorgensen* was a class-action suit filed by Illinois judges against Governor Blagojevich and the Illinois Comptroller in their *official* capacities seeking a declaration that the governor's use of his veto to block a judicial pay raise was unconstitutional. 811 N.E.2d at 654-59. In rejecting Blagojevich's claim of legislative immunity, the Illinois Supreme Court specifically explained that the judges were not trying to hold the governor personally liable, nor were they "attempting to force him to take or to refrain from taking any particular action." *Id.* at 666. There was "nothing unusual about his inclusion as a party," the court said, because he was "one of the state officials involved in the sequence of events" that led to the judiciary's failure to receive a cost-of-living increase. *Id.* The rejection of immunity in a case like *Jorgensen* is unsurprising; state officials are obviously not shielded from all judicial review of the constitutionality of legislative acts. *See Powell v. McCormick*, 395 U.S. 486, 503 (1969)

("Legislative immunity does not, of course, bar all judicial review of legislative acts."). In short, the type of legislative immunity from personal-damages suits articulated in *Tenney* simply was not implicated in *Jorgensen*.

Indeed, *Jorgensen* did not address common-law legislative immunity *at all*. Instead, the Illinois Supreme Court relied on Article IV of the Illinois Constitution—Illinois' equivalent of the U.S. Constitution's Speech or Debate Clause—and § 107-7 of the Illinois Code of Criminal Procedure. 811 N.E.2d at 666. The state constitution's speech-and-debate provision is limited by its terms to members of the Illinois General Assembly and is plainly inapplicable to Blagojevich. *Id.* The same would be true of the U.S. Constitution's Speech or Debate Clause, which applies only to legislators and their aides. *See Gravel*, 408 U.S. at 616-17. But federal common-law legislative immunity is distinct from and broader than the federal constitution's Speech and Debate Clause. *See United States v. Gillock*, 445 U.S. 360, 372 n.10 (1980) ("Despite the frequent invocation of the federal Speech or Debate Clause in *Tenney*, the Court has made clear that the holding was grounded on its interpretation of federal common law, not on the Speech or Debate Clause.").

Recognizing this distinction, state courts, like federal courts, have not hesitated to extend common-law legislative immunity to executive officials, including governors. *See, e.g., Humane Soc'y of N.Y. v. City of New York*, 729 N.Y.S.2d 360, 363 (N.Y. Sup. Ct. 2001) ("The Speech or Debate Clause applies by its terms only to 'members' of

the legislature. However, a similar common-law legislative privilege is applicable to government officials in the executive branch when engaged in legislative activities."); *Mandel v. O'Hara*, 576 A.2d 766, 781 (Md. 1990) (governor entitled to common-law legislative immunity for legislative acts despite literal wording of state constitutional provision). For all these reasons, the casinos—and the district court too—have simply misread *Jorgensen*. It is not at all clear that if presented with a proper claim of common-law legislative immunity, the Illinois Supreme Court would limit the immunity to members of the legislature.[6]

Regardless, it is abundantly clear that for this *federal* claim in *federal* court, state legislative-immunity law has no effect; federal immunity doctrine applies. And under that doctrine Blagojevich is immune from this civil RICO action and must be dismissed from the suit. The RICO claim may proceed in his absence, however; Johnston, Balmoral, Maywood, and Friends of Blagojevich remain as defendants.[7]

---

[6] We agree with our dissenting colleague that *Jorgensen* was an unusual case. But we do not agree that this means we should certify the immunity question to the Illinois Supreme Court. That approach assumes that the scope and content of federal common-law legislative immunity is determined by reference to state law. It is not. *See Bogan*, 523 U.S. at 48-49; *Lake Country Estates*, 440 U.S. at 404-05; *Tenney*, 341 U.S. at 372.

[7] In the district court, Blagojevich asserted that legislative immunity required dismissal of the RICO claim against

(continued...)

## B.  Tax Injunction Act

We now move to the question raised in the casinos' appeal: Does the Tax Injunction Act block the court's jurisdiction to impose a constructive trust on the proceeds disbursed from the Horse Racing Fund? The district court answered "yes" and dismissed the constructive-trust claim for lack of jurisdiction, denied the casinos' motion for a preliminary injunction, and dissolved the TRO. A decision denying a preliminary injunction may be immediately appealed. 28 U.S.C. § 1292(a)(1). Whether the Tax Injunction Act applies is a question of law that we review de novo. *United States v. Rosenbohm*, 564 F.3d 820, 822 (7th Cir. 2009).

The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Supreme Court has explained that "the principal purpose of the [Tax Injunction Act] [i]s to 'limit drastically' federal-court interference with 'the collection of [state] taxes.'" *Hibbs v. Winn*, 542 U.S. 88, 105 (2004) (quoting

---

[7] (...continued)

Friends of Blagojevich because proximate cause could not be proved without inquiry into acts protected by legislative immunity. Whatever the merits of this argument, Friends of Blagojevich is not a party to this appeal and is not itself entitled to immunity. Our conclusion regarding legislative immunity extends only to Blagojevich himself.

*California v. Grace Brethren Church*, 457 U.S. 393, 408-09 (1982)). But the Court "reads the statute narrowly to bar only claims that would reduce the flow of state tax revenue." *Levy v. Pappas*, 510 F.3d 755, 760 n.1 (7th Cir. 2007). On this understanding, the Act does not prohibit "federal-court interference with all aspects of state tax administration," *Hibbs*, 542 U.S. at 105 (quotation marks omitted), but operates more narrowly to prevent federal courts from interfering with a state's collection of tax revenue, *see id.* at 106 ("Our prior decisions [regarding the Act] are not fairly portrayed cut loose from their secure, state-revenue-protective moorings."). "If the relief sought 'would . . . operate[] to reduce the flow of state tax revenue' or would tie up 'rightful tax revenue,' then the Act bars federal jurisdiction over the claims." *Levy*, 510 F.3d at 762 (quoting *Hibbs*, 542 U.S. at 106, and *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 527-28 (1981)); *see also Scott Air Force Base Props., LLC v. Cnty. of St. Clair*, 548 F.3d 516, 520 (7th Cir. 2008) (Tax Injunction Act applies if "the relief sought would diminish or encumber state tax revenue").

A threshold question under the Act is whether the casino surcharge is a "tax." The racetracks maintain that it is and therefore the Act applies; their argument is based largely on the Illinois Supreme Court's decision in *Empress Casino v. Giannoulias*. The racetracks contend that we should defer to the way the state supreme court characterized the surcharge in upholding it against the casinos' constitutional challenges. This argument is misplaced. Whether a particular state or local assessment is a tax for purposes of the Tax Injunction Act is

a question of federal law. *Wright v. Riveland*, 219 F.3d 905, 911 (9th Cir. 2000); *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir. 1987); *Tramel v. Schrader*, 505 F.2d 1310, 1315 n.7 (5th Cir. 1975). That the surcharge survived uniformity and public-purpose clause challenges under the state constitution is irrelevant to this question.

A common difficulty in applying the Tax Injunction Act is distinguishing between a "tax" and a "regulatory fee." Fees assessed pursuant to a regulatory scheme fall outside the ambit of the Act, and so federal suits challenging state or local regulatory fees do not implicate the Act's jurisdictional bar. *Hager v. City of W. Peoria*, 84 F.3d 865, 870-71 (7th Cir. 1996); *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 930-31 (9th Cir. 1996); *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685-87 (1st Cir. 1992). We have explained the distinction in this way:

> Courts faced with distinguishing a "tax" from a "fee" "have tended . . . to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's cost of regulation."

*Hager*, 84 F.3d at 870 (quoting *San Juan Cellular*, 967 F.2d at 685).

Our decision in *Hager* drew on the First Circuit's influential opinion in *San Juan Cellular*, in which then-Judge Breyer elaborated on the difference between a tax and a regulatory fee for purposes of the Tax Injunction Act:

> [Courts] have sketched a spectrum with a paradig-matic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contrib-uted to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its reg-ulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*San Juan Cellular*, 967 F.2d at 685 (citations omitted). *San Juan Cellular* was a challenge to a 3% "periodic fee" as-sessed by the Puerto Rico Public Service Commission on the revenues of a private cellular-telephone company as a condition of its operating permit. The fee was assessed by a regulatory agency, placed in a special fund, and used not for general governmental purposes but to defray the costs of the agency's regulatory activities. *Id.* at 686. On these facts the First Circuit held that "the 'periodic fee' is a regulatory 'fee,' not a tax," and there-fore the Tax Injunction Act did not apply. *Id.*

Applying these principles in *Hager*, we held that a permit fee assessed on trucks exceeding a certain weight limit on a three-block stretch of roadway in West Peoria, Illinois, was not a tax for purposes of the Tax Injunction Act. 84 F.3d at 871-72. The fee at issue in *Hager* had been adopted to promote public safety and help defray the

municipality's cost of maintaining the road; the point of the ordinance was to *regulate* the operators of large vehicles who used the road, not to *tax* them to raise general revenue. *Id.* at 871. We reached the opposite conclusion in *Schneider Transport, Inc. v. Cattanach*, 657 F.2d 128 (7th Cir. 1981), another case involving levies on trucks. In *Schneider* a trucking company sued the Wisconsin Secretary of Transportation to enjoin the imposition of a vehicle-registration fee on its fleet of trucks. Truck-registration fees were deposited in the state's transportation fund and used for general transportation purposes, "including highway construction." *Id.* at 132. We concluded that the fee was a tax for purposes of the Tax Injunction Act. *Id.* Unlike the permit fee in *Hager*, the fee in *Schneider* was "imposed for revenue-raising purposes, a characteristic of any tax." *Id.*; *see also Hager*, 84 F.3d at 872 n.6 (distinguishing *Schneider*). Though the fees were held in the state transportation fund and not commingled with general state revenues, the money was allocated to highway construction and other traditional governmental services pertaining to the operation and maintenance of the state's transportation infrastructure. *Schneider*, 657 F.2d at 132.

The casino surcharge at issue here has none of the normal characteristics of a tax. The surcharge is assessed as a "condition of licensure" and appears in the section of the Riverboat Gambling Act captioned "Owners [sic] Licenses." 230 ILL. COMP. STAT. 10/7. Though not dispositive, the Racing Acts never refer to it as a "tax." Other provisions in the Riverboat Gambling Act lay taxes on riverboat casinos for general public purposes.

For example, section 13 of the Riverboat Gambling Act, entitled "Wagering tax; rate; distribution," lays out a detailed tax scheme applicable to all riverboat casinos. *Id.* § 10/13. The taxes collected under this section are explicitly referred to as "tax revenue" subject to appropriation by the Illinois General Assembly; the revenue supports traditional governmental services (e.g., the criminal justice system, education) and is distributed to the counties in which the casinos are situated. *Id.* § 10/13(b), (c-20), (d).

In contrast, the casino surcharge simply skims profits from a handful of private companies for the direct benefit of a few of their competitors. It applies only to the state's four highest-earning riverboat casinos, not a broader segment of the population. The money is deposited in a special segregated account, not the state's general revenue fund, and is disbursed within a few days directly to the racetracks. Not a penny can be touched by any state agency or used for any state program or expense. In short, the surcharge raises no state revenue in the usual sense—or in any sense, really. It's not even a classic regulatory fee, since no part of it goes to support the state's gaming regulatory apparatus. As this regulatory scheme is set up, the state is little more than a middleman for the involuntary transfer of property from one private owner to another.

It is immaterial that the Racing Acts place certain restrictions on how the racetracks may spend the money they receive. All of the money—100%—is for their sole private benefit; none of it—zero—may be used for any

state expense. In this sense, the casino surcharge is even *less* like a tax than the permit fee in *Hager,* the proceeds of which were put toward road repairs, a traditional public service; nonetheless, we held there that the Tax Injunction Act did not apply. *Hager*, 84 F.3d at 871. And the surcharge is nothing like the truck-registration fee at issue in *Schneider*, which we said was a tax; the registration fee was collected from trucking firms to pay for highway construction and other general state transportation needs.

The obvious object of the casino surcharge is not to raise money for a governmental program or public service but to protect the racetracks from the effects of competition from riverboat gambling. This purpose is regulatory, not revenue-raising. A constructive trust on the proceeds of the Horse Racing Fund would have no effect on the public fisc; it would defeat the state's regulatory purpose but would not "operate[] to reduce the flow of state tax revenue." *Levy*, 510 F.3d at 762.

That the General Assembly identified an *indirect* public benefit from propping up the racetracks is not enough to make the casino surcharge a tax. On this point the Ninth Circuit's decision in *Bidart* is instructive. In that case, the court held that the Tax Injunction Act did not bar a federal suit challenging the California Apple Commission's assessment of fees on apple producers to support advertising and other activities designed to boost apple consumption. 73 F.3d at 927. Like the Racing Acts here, the enabling legislation at issue in *Bidart* contained findings about the importance of the apple

industry to the state's economy. *Id.* (noting legislative findings to the effect that "[t]he maintenance of the apple industry . . . is necessary to assure the public of a continuous supply of this vital food product and the maintenance of needed levels of income for those persons engaged in the industry"). No matter; the court held that the apple assessment was a regulatory fee, not a tax. "The indirect benefit that may accrue to California's general populace through increased demand for apples as a result of advertising or education is not the type of public benefit that makes an assessment a tax." *Id.* at 933.

Finally, we note that the 2006 and 2008 Racing Acts were enacted under the state legislature's police power, not its tax power.[8] Casino gaming and horse-track betting are highly regulated industries. The Riverboat Gambling Act, which the Racing Acts amend, is explicit that its authority is drawn from the police power. *See* 230 ILL. COMP. STAT. 10/2(b) ("[R]egulatory provisions of this [Riverboat Gambling] Act are designed to strictly regulate the facilities, persons, associations and practices related to gambling operations pursuant to the *police*

---

[8] The General Assembly's authority to enact the Racing Acts must be located in one of two plenary legislative powers—the power to tax or the police power. When we raised this issue at oral argument, counsel suggested that the source of the legislature's power was either the uniformity clause or the public-purpose clause of the Illinois Constitution. This is incorrect; the uniformity and public-purpose clauses are *limits* on state legislative power, not *sources* of it.

*powers* of the State, including comprehensive law enforcement supervision." (emphasis added)). Similarly, the legislature's authority to regulate horse racing resides in the police power. *See Finish Line Express, Inc. v. City of Chicago*, 379 N.E.2d 290, 292 (Ill. 1978) (It is "undisputed" that gambling on horse races is subject to regulation or complete prohibition under the legislature's police power.). This supports our conclusion that the casino surcharge is properly characterized as a regulatory penalty or fee, not a tax. *See Hager*, 84 F.3d at 871 (permit fee enacted under a municipality's police power rather than its taxing power is not a tax).

Because the surcharge is not a tax, a constructive trust on the proceeds of the Racing Acts will not interfere with the state's collection of tax revenue, and the Tax Injunction Act does not apply. There is no jurisdictional bar to the constructive-trust claim and no jurisdictional basis to deny the casinos' motion for a preliminary injunction.[9]

---

[9] The Supreme Court's decision in *Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323 (2010), does not affect our decision. The question in *Levin* was whether the doctrine of comity precludes the exercise of federal-court jurisdiction in a case challenging a state tax as discriminatory in violation of equal protection or the dormant Commerce Clause. *Id.* at 2332-33. *Levin* was a suit against the Ohio Tax Commissioner by sellers of natural gas seeking declaratory and injunctive relief invalidating tax exemptions given to their competitors. The Court held that the claim of discriminatory taxation must proceed originally in state court, even when "framed as a request to increase a

(continued...)

## C. Preclusion and Abstention

In the district court, the racetracks advanced several alternative reasons to dismiss the constructive-trust claim and deny preliminary injunctive relief, and they reiterate these arguments on appeal. The scope of our review of an interlocutory order under 28 U.S.C. § 1292(a)(1) extends to arguments that "bear upon and are central to the grant or denial of the injunction." *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1124 (7th Cir. 1983). These additional arguments provide an alternative basis on which to affirm and are therefore properly before us. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction 'is not confined to the act of granting the injunctio[n], but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the] bill, and, if so, to directing a final decree dismissing it.'" (citations omitted)).

We start with the preclusion argument. Federal courts must give state-court judgments the same preclusive effect they would have in state court. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 519 (1986); 28 U.S.C. § 1738.

---

[9] (...continued)

commercial competitor's tax burden." *Id.* at 2327. Because *Levin* was a federal constitutional challenge to the validity of Ohio's natural-gas taxation scheme brought against the state taxing authority, it entailed "the very interference in state taxation the comity doctrine aims to avoid." *Id.* at 2335. In contrast, here, the casinos' suit will not interfere with Illinois' collection of state tax revenue.

Under Illinois law "[t]he doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Hudson v. City of Chicago*, 889 N.E.2d 210, 213 (Ill. 2008) (quotation marks omitted). Res judicata requires: (1) a final state-court judgment on the merits; (2) identity of cause of action; and (3) identity of parties or their privies. *Id.* Res judicata bars not only issues that were actually litigated in the prior proceeding but also issues that could have been raised but were not. *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998). That is, "[t]he doctrine extends not only to what was actually decided in the original action, but also to matters which could have been decided in that suit*." Rein v. David A. Noyes & Co.*, 665 N.E.2d 1199, 1204 (Ill. 1996).

The state supreme court's decision rejecting the constitutional challenges to the 2006 Racing Act does not have res judicata effect here; the claims and parties in the two suits are materially different. In *Giannoulias* the casinos challenged the validity of the 2006 Racing Act under various provisions of the Illinois Constitution and the Takings Clause of the federal constitution. The constructive-trust claim, in contrast, is based on allegations of a criminal pay-to-play conspiracy that has unjustly enriched the racetracks at the casinos' expense. Indeed, the allegations of political corruption at the root of RICO-conspiracy and constructive-trust claims did not even come to light until December 2008—six months *after* the Illinois Supreme Court delivered its decision in *Giannoulias*. The claims also involve different parties.

The constitutional challenge was brought against the state treasurer and the Illinois Racing Board; the constructive-trust claim is brought against the race-tracks, and the RICO claim on which it is based is against Johnston, Balmoral, Maywood, and Friends of Blagojevich. It would have made no sense for the casinos to name any of these defendants in their constitutional challenge to the 2006 Racing Act.

The racetracks attempt to fashion a res judicata argument around the Will County court's order denying their petition for postjudgment relief, which was based on some of the information made public by the U.S. Attorney in the federal prosecution of Blagojevich and in the impeachment proceedings against him. But postjudgment proceedings are limited in scope to the underlying case; the purpose of a § 2-1401 petition is to bring to the court's attention facts that had they been known at the time of judgment would have precluded its entry. *People v. Haynes*, 737 N.E.2d 169, 182 (Ill. 2000). A § 2-1401 petition is analogous to a motion for relief from judgment under Rule 60(b)(2) of the Federal Rules of Civil Procedure. *See In re Marriage of Wolff*, 822 N.E.2d 596, 604 (Ill. App. Ct. 2005). Like a motion made under the federal rule, a § 2-1401 petition is not a vehicle to bring new claims—let alone entirely different claims against parties that intervened in the action *after* the original judgment was entered.[10]

---

[10] The racetracks argue that Illinois law does not distinguish for res judicata purposes between an intervenor and an original

(continued...)

A brief look at how the Will County judge treated the § 2-1401 petition shows that the ruling does not preclude this federal action. First, the judge did not address the alleged criminal scheme involving Blagojevich, Johnston, and the racetracks on the merits. Instead, she rejected the "new evidence" out of hand because it was unrelated to the underlying constitutional challenge. The judge held that improper motive was not a basis on which to invalidate the 2006 Racing Act. The court also rejected most of the evidence submitted in support of the petition—the FBI agent's affidavit, superseding indictment, and wiretap transcripts—as inadmissible hearsay unrelated to the case and involving different parties. The judge said that even if she were inclined to credit the allegations of corruption, they would have no effect on the constitutionality of the 2006 Act and thus no effect on the final judgment—which is, after all, the limited purpose of a § 2-1401 petition.

The racetracks cite *State Farm Illinois Federal Credit Union v. Hayes*, 416 N.E.2d 703 (Ill. App. Ct. 1981), which they say establishes the res judicata effect of decisions on § 2-1401 petitions. But *Hayes* was part of a line of cases holding that § 2-1401 decisions have res judicata effect on *successive* § 2-1401 petitions, *not* on entirely new

---

[10] (...continued)

party. However, they cite only cases in which *intervening plaintiffs* were barred from bringing subsequent, related suits after they had lost. They cite no authority for the proposition that res judicata bars subsequent, different claims against *defendants* who intervened *after* the original judgment.

actions filed against different parties. *See, e.g.*, *Vill. of Glenview v. Buschelman*, 693 N.E.2d 1242 (Ill. App. Ct. 1998) ("The [Illinois] supreme court's decisions in *Deckard v. Joiner*, 44 Ill.2d 412, 418-19, 255 N.E.2d 900 (1970), and its progeny have steadily held that repeated [§ 2-1401 petitions] are prohibited, as they unnecessarily frustrate the policy of bringing finality to court proceedings."). The reason for this rule is obvious: It cuts down on the waste of judicial resources by preventing litigants from plying courts with the same losing arguments again and again. The rule has no application here.

The racetracks also cite *Burnicka v. Marquette National Bank*, 431 N.E.2d 358, 360 (Ill. 1982), which held that a § 2-1401 petition for relief from judgment is the "filing of a new action." But this short opinion had nothing to do with res judicata; it merely held that a petition for relief from judgment (formerly a motion made under § 72 of the Illinois Civil Practice Act) should be treated as a new action for purposes of the 30-day window for appeal of a final judgment.[11] *Id.*

---

[11] The Racetracks also cite *Lubbers v. Norfolk & Western Railway*, 473 N.E.2d 955 (Ill. 1984), a case in which the Illinois Supreme Court remanded with instructions to allow a plaintiff to amend a § 2-1401 petition to include an additional claim. But in *Lubbers* the claim to be added—a count asserting "wilful and wanton" misconduct—was joined to a negligence claim only after it had become clear that the defendant won the case because it had concealed key evidence. *Id.* at 959-60. At most, *Lubbers* shows that *related* claims against the *same*

(continued...)

In sum, neither the Illinois Supreme Court's decision in *Giannoulias* nor the decision denying the casinos' § 2-1401 petition has res judicata effect on the constructive-trust or RICO claims here. The claims were not decided and could not have been raised in the action challenging the constitutionality of the 2006 Racing Act. *See Rein*, 665 N.E.2d at 1204. For the same reasons, the state court's decision rejecting the casinos' constitutional challenge to the 2008 Act has no res judicata effect either.

Having concluded that res judicata does not apply, we have little trouble holding that the casinos' claims are not barred by collateral estoppel. Under Illinois law the "minimum requirements" for application of collateral estoppel are:

> (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.

*Gumma v. White*, 833 N.E.2d 834, 843 (Ill. 2005). Because the issues decided in the state-court constitutional challenges are different from the issues to be decided in

---

[11] (...continued)

defendant *may* be brought in a § 2-1401 petition; it does not stand for the broad proposition that *unrelated* claims against *different* defendants *must* be brought in a § 2-1401 petition. And it certainly does not mean that the failure to bring such unrelated claims operates as res judicata.

this federal racketeering suit, collateral estoppel does not apply.

Relatedly, we also reject the racetracks' contention that abstention is warranted under the *Colorado River* doctrine. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). The racetracks maintain that *Colorado River* applies because the suit challenging the constitutionality of the 2008 Act suit is still winding its way through the Illinois courts. *Colorado River* abstention is exercised sparingly and is only appropriate when "there is a substantial likelihood that the [state-court] litigation will dispose of all claims presented in the federal case." *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 592 (7th Cir. 2005) (citation omitted). This will only be the case when the state and federal actions are "parallel"; absent that, *Colorado River* abstention is inapplicable. *Id.* As should be obvious by now, the state and federal actions are not parallel. *Colorado River* abstention does not apply.

## D. Failure to State a Constructive-Trust Claim

Finally, the racetracks argue that the casinos have failed to state a constructive-trust claim. This is actually a backdoor challenge to the sufficiency of the RICO allegations; the constructive-trust claim is not an independent basis for liability but instead seeks an equitable remedy for the underlying RICO violation to prevent the racetracks from being unjustly enriched. Balmoral and Maywood—the racetracks Johnston

owns—argue that we should affirm the dismissal of the constructive-trust claim because the conduct underlying the RICO count was not a proximate cause of the casinos' injury. The cause of the injury, they assert, is the drafting and enactment of the Racing Acts by the Illinois General Assembly, not any conspiracy among the RICO defendants. They made the same argument in the district court in support of their motion to dismiss the RICO count for failure to state a claim. The district court rejected it, and we agree. The casinos' allegations are sufficient to support RICO proximate cause.

The Supreme Court has said that when evaluating proximate causation under RICO, "the central question . . is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). A RICO plaintiff must show that the predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (quotation marks omitted). What this means is that the link between the alleged RICO conspiracy and the plaintiff's injury must not be "too remote," or "purely contingent," or "indirec[t]." *Id.* (citation omitted).

The casinos allege the following: that the 2006 and 2008 Racing Acts were the product of a corrupt bargain between Blagojevich and Johnston; that Blagojevich solicited and Johnston paid large sums of money to the governor's campaign committee in exchange for the governor's influence in getting the Racing Acts passed and for signing them into law; that Blagojevich

delivered on this agreement; and that by operation of these two corruption-tainted laws, they are forced to turn over 3% of their profits to the racetracks. These allegations state a direct line of causation. The casinos' injury is not too remote from the conspiracy; to the contrary, the object of the conspiracy was to put money in Blagojevich's pocket (or in his campaign committee's coffers) in exchange for the enrichment of the racetracks at the casinos' expense via the enactment and signing of the Racing Acts. The casinos' injury flowed directly from the conspiracy, or so a reasonable jury could conclude.

Arlington, Fairmount, and Hawthorne make two separate arguments relating to the legal sufficiency of the constructive-trust claim. They contend that the constructive-trust claim was properly dismissed because (1) the constitutionality of the Racing Acts has already been upheld by the state courts; and (2) a constructive trust would be an impermissible attack on the state-court judgments.[12] These are variations on the preclusion arguments earlier discussed, and we reject them for reasons that are by now familiar—namely, that the state- and federal-court actions involve different claims and parties.

A constructive trust is "an equitable remedy imposed by a court to prevent the unjust enrichment of a party through actual fraud or breach of a fiduciary relationship."

---

[12] The casinos believe that these arguments have been waived. They were not waived. The arguments were raised, with minor variation, in Hawthorne's briefing in district court.

*In re Liquidation of Sec. Cas. Co.*, 537 N.E.2d 775, 782 (Ill. 1989). The casinos may prove that the racetracks were unjustly enriched by the RICO conspiracy without reference to the constitutionality of the Racing Acts. Their claim here is that the Acts are tainted by corruption, not that they are unconstitutional.

In a different twist on the same argument, the racetracks maintain that the constructive-trust claim cannot proceed because the state courts have determined that the casinos must pay the surcharge and that they (the racetracks) are entitled to receive the proceeds from the Horse Racing Fund. The state-court orders do not speak quite so broadly. The state courts dismissed the casinos' suits under the Protest Monies Act and ordered the state treasurer to transfer the money to the Horse Racing Fund. From there the Racing Acts functioned—and continue to function—normally. An order from the district court in this case would not disturb these state-court judgments. A constructive trust would operate on the special escrow account now holding the money disbursed from the Horse Racing Fund. The TRO is structured so that it does not enjoin the Illinois Treasurer from performing actions prescribed by state law or required by state-court order.

Finally, the racetracks suggest that a constructive trust would, in essence, repeal the Racing Acts—an action a federal court obviously has no authority to take.[13] But

---

[13] For this argument the racetracks cite *In re Liquidation*, which held that a court of equity has no power "to dispense with

(continued...)

a constructive trust on the disbursements received from the Horse Racing Fund would neither nullify the Racing Acts nor undo the state-court judgments. True, it would prevent the racetracks from receiving payments from the Fund, but only because the casinos will have proven that they were unjustly enriched by the RICO conspiracy—not that the Racing Acts or any order entered by a state court was invalid.

For the foregoing reasons, we REVERSE the district court's order denying Blagojevich's claim of legislative immunity and REMAND with instructions to dismiss him from the case. We also REVERSE the district court's order dismissing the constructive-trust claim for lack of jurisdiction, denying preliminary injunctive relief, and dissolving the TRO. The case is REMANDED for further proceedings consistent with this opinion. The TRO shall remain in effect.

---

[13] (...continued)

the plain requirements of a statute." *In re Liquidation of Sec. Cas. Co.*, 537 N.E.2d 775, 782 (Ill. 1989) (quotation marks omitted). In that case, the defrauded shareholders of an insurance company sought to place a constructive trust on the proceeds of a stock offering; the court held that this remedy was precluded by the exclusive scheme of the Illinois Insurance Code governing the distribution of assets from a liquidated insurer's estate. *Id.* at 781-82. The case does no more than illustrate the unremarkable principle that a court of equity cannot invalidate a "comprehensive statutory scheme." *Id.* at 781. This principle is not implicated here.

POSNER, *Circuit Judge*, dissenting. I disagree with the decision in two respects that merit airing in a public dissent. The first is whether ex-Governor Blagojevich is entitled to legislative immunity in this RICO suit, as the majority believes, and the second is whether, as the majority does not believe, the Tax Injunction Act, 28 U.S.C. § 1341, bars the district court from imposing a constructive trust in favor of the casino plaintiffs on the money received by the racetracks under the 2006 and 2008 Illinois statutes that impose a 3 percent excise tax on the casinos and require that the proceeds be placed in a segregated state fund—the "Horse Racing Equity Trust Fund"—and then promptly disbursed to the racetracks to be used as prescribed by the statutes. Ill. Pub. Act 94-804, effective May 26, 2006; Ill. Pub. Act 95-1008, effective Dec. 15, 2008. It is sufficiently uncertain whether Blagojevich is entitled to immunity to warrant certifying the question to the Supreme Court of Illinois. But there is no doubt that the Tax Injunction Act bars the imposition by a federal district court of a constructive trust on revenues from the casino tax.

1. When a state employee is sued in federal court for violating a federal statute, whether he is immune from suit by virtue of his official status is a question of federal law, ordinarily federal common law. *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 732 (1980); *United States v. Gillock*, 445 U.S. 360, 372 n. 10 (1980); *Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009); *Fowler-Nash v. Democratic Caucus of Pennsylvania House of Representatives*, 469 F.3d 328, 330-31 (3d Cir. 2006); *National Ass'n of Social Workers v. Harwood*, 69

F.3d 622, 629 (1st Cir. 1995). Were the scope of official immunity determined by state law, a state could prevent the federal courts from enforcing federal statutes, such as RICO—which are frequently enforced against employees of state or local government, e.g., *United States v. Genova*, 333 F.3d 750 (7th Cir. 2003); *United States v. Thompson*, 685 F.2d 993 (6th Cir. 1982) (en banc); *United States v. Long*, 651 F.2d 239 (4th Cir. 1981); *United States v. Baker*, 617 F.2d 1060 (4th Cir. 1980)—to the full extent intended by Congress. What is unusual about this case is that the State of Illinois appears to give its governors less immunity than the federal common law might otherwise do; and why should federal courts grant defendants who are state employees a broader official immunity than those defendants would be entitled to if sued under state law? The interest in giving state officers immunity from suit is a state interest. If a state places no value on that interest in a particular setting, such as a suit against the state's governor, there is no reason for a federal court, enforcing a federal statute, to grant the state official immunity from suit.

In *Jorgensen v. Blagojevich*, 811 N.E.2d 652 (Ill. 2004), the Supreme Court of Illinois had to decide whether a suit on behalf of the state's judges could be maintained against the governor, who had vetoed a bill granting the judges a cost-of-living increase. The court ruled that the governor was not entitled to legislative immunity. (The court went on to hold, on the merits, that the veto violated a provision of the Illinois constitution that forbade reducing judges' compensation, because the cost-of-living increase had vested and thus become a part

of their compensation and therefore could not be re-
scinded. *Id.* at 665-66.) The ruling on immunity was
surprising because the Governor of Illinois, like the
President of the United States, is effectively a third
branch of the legislature by virtue of his veto power.
*Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998); *Edwards v.
United States*, 286 U.S. 482, 490 (1932). And so when a
governor is performing his legislative role, as Governor
Blagojevich was doing when he vetoed the cost-of-living
bill, he is—or so one might think—entitled to the same
immunity as legislators.

That is the general rule, *Baraka v. McGreevey*, 481 F.3d
187, 196-98 (3d Cir. 2007); *Torres-Rivera v. Calderón-Serra*,
412 F.3d 205, 212-13 (1st Cir. 2005); *Women's Emergency
Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003); cf. *Bogan
v. Scott-Harris*, *supra*, 523 U.S. at 55 (mayor), but it may not
be the rule in Illinois after *Jorgensen*. The opinion said
that the suit did not seek "to hold the Governor
personally liable for his actions, nor are [the judges]
attempting to force him to take or to refrain from
taking any particular action. He was named in the litiga-
tion because he was one of the state officials involved
in the sequence of the events which led to the failure of
the Judges to receive their" cost-of-living increase. 811
N.E.2d at 666. But the judgment nullified his legislative
act—the veto—and the opinion goes on to note that
"examples of Illinois governors being joined as de-
fendants in cases seeking declaratory and injunctive
relief based on alleged violations of state constitutional
and legal requirements are commonplace." *Id*. Presidents
and governors are routinely enjoined from enforcing

unconstitutional statutes, but—precisely because such statutes can be enjoined—it would be extremely odd to sue a President or a governor for having signed an unconstitutional bill into law; his act would be harmless. If such a suit is what *Jorgensen* permits, the Supreme Court of Illinois has modified traditional legislative immunity. The opinion goes on to state that "in Illinois, legislative immunity is addressed in" a constitutional and a statutory provision neither of which, the court ruled, "is applicable to the Governor." *Id.* This sounds like the renunciation of a common law power to add to legislatively specified immunities.

But *Jorgensen* was an unusual case, and may not be applicable to our case. The legislative act enjoined was not a statute, but a veto by the governor; if not he, who would be sued? If he were granted immunity, there would be no way to nullify his unconstitutional act.

We cannot be certain, however, that the Illinois court would confine *Jorgensen* to vetoes. Legislative immunity is absolute, *Bogan v. Scott-Harris*, *supra*, 523 U.S. at 54-55; *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 403-05 (1979); *Biblia Abierta v. Banks*, 129 F.3d 899, 903-04 (7th Cir. 1997), and the present suit accuses the governor of having signed the racetrack legislation because he had been bribed to do so. One can imagine the Supreme Court of Illinois, given its skepticism about granting a governor legislative immunity, holding that a governor has only a *qualified* immunity for his legislative acts—an immunity that would not shield him from being sued for accepting

bribes to sign laws. The court might think it odd that were Blagojevich convicted for criminal acts that included the racetrack bribe he could not be sued civilly for the same acts.

It is true that the *federal* common law of legislative immunity for state officials, since it is an immunity from civil suits, does not bar criminal actions, while barring civil actions even if based on charges of criminal misconduct. *United States v. Gillock, supra*, 445 U.S. at 372-73. (The legislative immunity of *federal* legislators is broader because of the Constitution's "speech or debate" clause. U.S. Const. art I, § 6, cl. 1; *United States v. Gillock, supra*, 445 U.S. at 366-73; *In re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289, 295 (7th Cir. 2002); *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 30 (1st Cir. 1996).) Other-wise the immunity would not be absolute. The Court in *Gillock*, in refusing to extend the immunity to criminal prosecutions, reasoned that the federal interest in enforcing federal criminal laws is greater than the interest in enforcing civil laws. But the Supreme Court of Illinois gives less weight to the legislative interest in immunity from civil cases than the federal rule does. One doubts therefore that the Illinois court would grant a governor absolute legislative immunity.

If this is right, we should give him no greater immunity in the name of federal common law. The Supreme Court has said that the displacement of state law by federal common law is "limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law.' Our cases

uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision. Not only the permissibility but also the scope of the judicial displacement of state rules turns upon such a conflict." *O'Melveney & Myers v. FDIC*, 512 U.S. 79, 87-88 (1994) (citations omitted). "[A] court should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards, or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand. Otherwise, we have indicated that federal courts should 'incorporat[e] [state law] as the federal rule of decision,' unless 'application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.'" *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98 (1991) (citations omitted); see also *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979); *Miller v. Illinois Central R.R.*, 474 F.3d 951, 952-53 (7th Cir. 2007); *FDIC v. Braemoor Associates*, 686 F.2d 550, 554 (7th Cir. 1982); compare *United States v. Gillock*, 445 U.S. 360 (1980).

There is no federal interest in giving the Governor of Illinois a broader immunity from suit than he would enjoy in an Illinois state court, just as there is no federal interest in enforcing the Eleventh Amendment if a state decides to waive its sovereign immunity from suit. *Lapides v. Board of Regents*, 535 U.S. 613, 618-20 (2002); *Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 389 (1998); *Clark v. Barnard*, 108 U.S. 436, 447 (1883). It is true that state officials continue to enjoy official immunity

in federal suits after a state indemnifies its officials. *Greenberg v. Kmetko*, 922 F.2d 382, 384 (7th Cir. 1991); *Jaworski v. Schmidt*, 684 F.2d 498, 500 (7th Cir. 1982); *Buckles v. King County*, 191 F.3d 1127, 1136 (9th Cir. 1999), just as a state does not lose its Eleventh Amendment immunity from suit by having a right to be indemnified by the federal government. *Regents of University of California v. Doe*, 519 U.S. 425, 430-31 (1997). Some states have decided, rather than giving their employees immunity and thus denying relief to victims of the employees' torts, to abrogate immunity but indemnify their employees in cases in which the employees would have been immune. We have not followed suit when the state employee is sued for a federal civil rights violation, but that is because 42 U.S.C. § 1988(a) reverses in such cases the rule of *Kimbell Foods* of presumptive adoption of state law to furnish the content of federal common law. Section 1988(a) provides that the "jurisdiction in civil and criminal matters conferred on the district courts by the [federal civil rights law] . . . shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable . . .; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law," state law shall apply. Section 1988(a) was first enacted as section 3 of the Civil Rights Act of 1866, 14 Stat. 27, and its presumption in favor of federal rules of decision was undoubtedly based on concerns about southern hostility to civil rights.

Interpretation of *Jorgensen* is further complicated by the fact that the suit did not seek damages from the

governor. Official immunity usually just means immunity from damages suits. *Pulliam v. Allen*, 466 U.S. 522, 536-38 (1984); *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, *supra*, 446 U.S. at 736-37; 13D Charles A. Wright et al., *Federal Practice and Procedure* § 3573.3, pp. 605-06, 615-16 (3d ed. 2008); David Achtenberg, "Immunity Under 42 U.S.C. § 1983: Interpretive Approach and the Search for the Legislative Will," 86 *Nw. U. L. Rev.* 497, 516-17 (1992). But legislative immunity confers immunity from injunctive relief as well, in Illinois, *Fletcher v. City of Paris*, 35 N.E.2d 329, 332 (Ill. 1941); *People ex rel. Huempfner v. Benson*, 128 N.E. 387, 388 (Ill. 1920), as elsewhere. *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, *supra*, 446 U.S. at 731-34; *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502-03 (1975).

For all these reasons, it is uncertain whether Illinois governors enjoy legislative immunity from suit—the only kind that Blagojevich is claiming. Given the delicacy of the issue and particularly the uncertain scope of the *Jorgensen* opinion, the prudent course for us in this case would be to certify to the Supreme Court of Illinois, pursuant to 7th Cir. R. 52 and Ill. S. Ct. R. 20, the question whether the common law of official immunity in Illinois permits a suit to go forward against a governor when the suit is based on his performing a legislative act (not limited to a veto) for a criminal purpose.

2. The Tax Injunction Act forbids federal district courts to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law," provided that an

adequate remedy is available in the state courts. 28 U.S.C. § 1341. The Act has been described by the Supreme Court as "first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522 (1981). The Court in *Ex parte Young*, 209 U.S. 123 (1908), had as a practical matter stripped away the states' sovereign immunity from equitable suits; so were it not for the Tax Injunction Act "'state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.'" *Rosewell v. LaSalle Nat'l Bank*, *supra*, 450 U.S. at 527, quoting *Perez v. Ledesma*, 401 U.S. 82, 128 n. 17 (1971) (separate opinion); see also *Hill v. Kemp*, 478 F.3d 1236, 1246-47 (10th Cir. 2007). And "it is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public." *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 109-10 (1871). Of course enjoining a particular tax is unlikely to "derange the operations of government." That was a bit of 1871-

style hyperbole. But the Tax Injunction Act is not limited to "deranging" taxes, and the majority opinion if it stands may make the application of the Act turn on judges' guesses concerning the importance of a particular tax to the operations of state government.

My colleagues may have difficulty taking the question of the effect of the Tax Injunction Act in this case seriously because of the corrupt origin of the casino tax and a certain risible element in the idea of taxing one gambling business to subsidize another (the "derangement" question). But the corrupt origin of the tax is irrelevant. The Act would be thwarted if a taxpayer could get a federal court to enjoin a tax case just by presenting evidence of corruption in the process by which the taxing statute had been enacted. This has been recognized in analogous contexts, see, e.g., *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 374-78 (1991) (state immunity from federal antitrust suits)—notably that of absolute immunity, *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967), as I pointed out in discussing the federal (but maybe not the Illinois) rule on legislative immunity.

Gambling taxes are not unusual; casino taxes may be, but they are certainly not unique. See Ind. Code §§ 4-33-12-1, -6(b)(6); N.J. Stat. §§ 5:12-203(a), -205; cf. Md. Code, State Gov't, §§ 9-1A-27(a)(5), -29. They are real taxes, not service fees. The fact that the revenue from a particular tax is earmarked for a particular purpose is hardly unusual; think of the social security tax. Horse racing, the beneficiary of the casino tax, is a major activity in

Illinois and one with considerable economic significance for the state. It employs more than 30,000 people and generates more than $700 million in annual betting and some $16 million in state and local government revenues. Ill. Pub. Act 94-804, § 1(3)-(4); Illinois Racing Board, "2009 Annual Report" 2, 6 (Mar. 2010), www.state.il.us/agency/irb/racing/reports/2009_Annual_Report.pdf (visited Feb. 15, 2011); Commission on Government Forecasting and Accountability, "Wagering in Illinois—2009 Update" 51-57 (2010), www.ilga.gov/commission/cgfa2006/Upload/2009wagering_in_il.pdf (visited Feb. 15, 2011). And that's just the beginning, because horse racing boosts the horse population of Illinois, which benefits breeders, horse farms, feed companies, and other commercial activities ancillary to horse racing. Bill Wright, "Where Illinois' Economy Gets Its Horsepower," *Chicago Tribune*, Mar. 10, 2002, p. 6. Governments routinely subsidize favored activities—not by taxing the persons or firms engaged in the activities, which would negate the subsidy, but by taxing someone else.

Casinos are recent additions to the legal gambling scene in Illinois; the first casino in the state opened in 1991. Jerry Shnay, "Alton Riverboat Already Hitting Jackpot," *Chicago Tribune*, Sept. 25, 1991, at 4. They compete with the racetracks and thus attract gamblers away from them. So at least it is widely believed, see Illinois Harness Horsemen's Ass'n, Press Release, "Top State Horsemen Flee to Greener Pastures in Eastern States" (Nov. 30, 2005), and William Nack, "A House Divided," *Sports Illustrated*, July 10, 1995, at 52, 56, though Douglas M. Walker and John D. Jackson, in their article "Do U.S. Gambling Industries Cannibalize Each Other?,"

36 *Public Finance Rev.* 308, 322-24 (2008), present contrary evidence—evidence that casino and other non-racetrack gambling increases the demand for racetrack gambling by increasing the demand for gambling in general. What is not debatable is that, whether because of the advent of casinos or because of other factors, racetrack attendance and revenues in Illinois have plummeted in recent years, along with the state's horse population and the commercial activities that are correlated with the number of horses. Illinois Racing Board, *supra*, at 9; Commission on Government Forecasting and Accountability, *supra*, at 56-57; Will Buss, "Hoffman: Bill Will Help Fairmount," *Belleville News-Democrat*, Mar. 27, 2008, p. A1. The first of these sources shows horse-racing bets falling from $1.2 billion in 1996 to $700 million in 2009, though some of the drop is doubtless attributable to the miserable economic situation in 2009, for the 2007 total was $900 million.

In a laissez-faire or Social Darwinist society, government would keep its hands off the competition between the casinos and the racetracks. The disappearance of racetracks, jockeys, horses, bridles, blacksmiths, racetrack touts, and DVDs of "National Velvet"—replaced by croupiers, glassy-eyed retirees at one-armed bandits, roulette wheels, and blackjack tables, all on riverboat casinos—would be commended as progress. But American government is not committed to the laissez-faire vision of society. Congress and state legislatures are constantly using their taxing and spending and regulatory powers to redistribute wealth from one group in society to another. This may be good or bad, but it

is routine and constitutional. Federal payroll taxes are earmarked for such programs as Medicare, social security, and unemployment benefits; the federal gasoline tax is used to subsidize highway construction; other earmarked taxes (taxes the revenues from which are specified for a particular use) are common. See Susannah Camic, "Earmarking: The Potential Benefits," 4 *Pitt. Tax Rev.* 55, 60-61 (2006). Rarely are the taxpayers closely matched with the recipients of the spending that the taxes support. The levying of taxes on a particular industry for the sole benefit of another industry is somewhat uncommon but certainly not unknown. For example, the federal Audio Home Recording Act of 1992 taxes digital media to subsidize prerecorded media, 17 U.S.C. § 1001 *et seq.*; the Illinois Coal Technology Development Assistance Fund taxes gas and electrical utilities to pay for the development of coal technologies, 30 ILCS 730/3; and Ohio taxes wine from all over the world to pay for research on grapes in Ohio. Ohio Rev. Code Ann. §§ 924.51 *et seq.*, 4301.43(B).

An excise tax on casinos is a tax, and where the tax money goes is irrelevant to the applicability of the Tax Injunction Act. Suppose the revenues from the casino tax were earmarked for cosmetic surgery for members of the Illinois legislature. Would anyone doubt that the casino tax was still a tax? Would it matter that the tax revenues were disbursed to the intended recipients of the subsidy funded by those revenues within 10 days of receipt? I think not, and yet the racetrack subsidy is less absurd than my hypothetical example. Sixty percent of the subsidy is earmarked for the purses for winners

and runners-up in horse races on the theory that bigger purses attract the owners of the better horses and the better the horses in a race the larger the attendance and therefore the more money is bet on the race and so the greater are the track's revenues because they're a percentage of the amount of money that is bet. The other 40 percent of the revenue from the casino tax is to be used for physical improvements of the racetracks. The subsidy is rationally designed to promote the horse racing industry in Illinois, which seems no less proper an objective than promoting a state's film industry by offering tax credits to filmmakers, a common form of state subsidy. Horse racing and movies are two forms of entertainment.

What is true is that not every state receipt is the fruit of a tax. Fees for services are not deemed taxes for purposes of the Tax Injunction Act. We have explained the difference as follows: "If the fee is a reasonable estimate of the cost imposed by the person required to pay the fee, then it is a user fee and is within the municipality's regulatory power. If it is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits, it is a tax, whatever its nominal designation." *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992). For examples of exactions held to be fees rather than taxes for purposes of the Tax Injunction Act, see *Hager v. City of West Peoria*, 84 F.3d 865, 870-71 (7th Cir. 1996) (fees for permits for use of certain streets by heavy trucks); *Government Suppliers Consolidating Services,*

*Inc. v. Bayh*, 975 F.2d 1267, 1271 n. 2 (7th Cir. 1992) (registration fees for waste-collection vehicles), and *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 4-6 (1st Cir. 1992) (annual fee imposed on owners of motor vehicles to fund compulsory accident compensation). For examples of exactions held to be taxes for purposes of the Act, see *Hill v. Kemp*, *supra*, 478 F.3d at 1243-46 (costs of specialty license plates; revenue in excess of administrative costs go to general fund and elsewhere); *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998) (city fee for fire protection); *Wright v. McClain*, 835 F.2d 143, 145 (6th Cir. 1987) (parolee's payments to a victim compensation fund); and cf. *Diginet, Inc. v. Western Union ATS, Inc.*, *supra*, 958 F.2d at 1399 ("franchise fee" imposed on use of a fiber optic network to generate revenues that are "use[d] to offset unrelated costs or confer unrelated benefits").

A potential source of confusion is that "courts faced with distinguishing a 'tax' from a 'fee' 'have tended . . . to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's cost of regulation.' " *Hager v. City of West Peoria*, *supra*, 84 F.3d at 870. The reference to "narrow benefits" may seem to describe this case, since only racetracks received the proceeds of the casino tax. But this is to ignore the words in the *Hager* opinion that follow "provides more narrow benefits": "to regulated companies or defrays the agency's cost of regulation." A fee matches revenue to cost: a doctor's fee pays for his service. The

tax on the casinos does not go to pay for some service that the State of Illinois renders to casinos; it goes to subsidize racetracks, and so it falls within the rule that exactions of money earmarked for designated purposes rather than just collected to swell the state's coffers are taxes within the meaning of the Tax Injunction Act whether or not they are levied for a purpose of which judges approve. *Schneider Transport, Inc. v. Cattanach*, 657 F.2d 128, 132 (7th Cir. 1981) (registration fee held to be a tax even though the tax revenues were deposited in a segregated fund, the state transportation fund, earmarked for state highway construction); *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 135 (4th Cir. 2000) (solid waste disposal assessment fee held to be a tax even though the revenues were earmarked for environmental clean up); *Wright v. McClain*, *supra*, 835 F.2d at 145 (charges earmarked for corrections held to be a tax). The majority opinion in the present case invokes *Bidart Brothers v. California Apple Comm'n*, 73 F.3d 925 (9th Cir. 1996), but that case involved an assessment of fees on apple producers to support advertising and other activities designed to boost apple consumption. The fees were to pay for services to the payors of the fees. Taxes are levied on people or firms who may derive no benefit at all from them, as in the present case. Workers who die before reaching the age of eligibility for social security receive no social security benefits, though they may have paid many thousands of dollars in social security taxes.

The practical reason for the difference in treatment under the Tax Injunction Act between fees and taxes is that enjoining the collection of a fee is less likely to

disrupt state programs than enjoining a tax. Fees are for services and if the collection of the fees is enjoined, the state can curtail the services. Cf. *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1383 (8th Cir. 1997); *San Juan Cellular Telephone Co. v. Public Service Comm'n of Puerto Rico*, 967 F.2d 683, 686-87 (1st Cir. 1992). But if the use of tax moneys to subsidize racetracks is enjoined, the subsidy program is halted until the injunction is lifted—unless the rule is to be that an earmarked tax, held to be enjoinable, can be replaced by a tax having a broader base. This would inject the federal courts deeply into the design of injunction-proof state taxes.

It is true that the plaintiffs are not seeking to enjoin the casino tax in the narrow sense of "enjoin"; the money has been collected and paid to the racetracks or placed in a separate fund that if the casinos lose this case will also be paid to the racetracks. But a constructive trust, just like an injunction, is an equitable remedy. *Bontkowski v. Smith*, 305 F.3d 757, 761 (7th Cir. 2002); *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919) (Cardozo, J.); 1 Dan B. Dobbs, *Law of Remedies* § 4.3(2), pp. 589-90 (2d ed. 1993). If allowed in cases in which an injunction would be unlawful, it would defeat the purpose of the Tax Injunction Act. So the Second Circuit held in the name of the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a)—the counterpart, in federal taxation, to the Tax Injunction Act—with regard to the imposition of a constructive trust on moneys that would otherwise have been used to satisfy federal tax liabilities. *SEC v. Credit Bancorp, Ltd.*, 297 F.3d 127, 137-38 (2d Cir. 2002).

Other forms of equitable relief have been held to be forbidden by the Tax Injunction Act when, even though no equitable relief was sought against the state itself, the relief sought would have indirectly but substantially interfered with tax collection by the state. In *Sipe v. Amerada Hess Corp.*, 689 F.2d 396, 403-04 (3d Cir. 1982), for example, the plaintiffs sought to enjoin their employers from deducting unemployment taxes from their paychecks. And in *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indemnity Co.*, 169 F.3d 448, 454-56 (7th Cir. 1999), the plaintiff sought a declaration that a tax certificate that the private defendant had purchased at a tax sale was invalid. In both cases the plaintiffs lost. See also *Blangeres v. Burlington Northern, Inc.*, 872 F.2d 327, 328 (9th Cir. 1989) (per curiam); cf. *California v. Grace Brethren Church*, 457 U.S. 393, 407-11 (1982); *Wright v. Pappas*, 256 F.3d 635 (7th Cir. 2001).

But even though, if I'm right, this suit is a challenge to a state tax, the Tax Injunction Act is a bar only if there is available to the plaintiffs a state remedy that is "plain, speedy and efficient." 28 U.S.C. § 1341; see, e.g., *Rosewell v. LaSalle Nat'l Bank*, *supra*, 450 U.S. at 512-15. There is. The casinos can ask an Illinois state court to impose a constructive trust on the tax receipts. See *Village of Itasca v. Village of Lisle*, 817 N.E.2d 160, 170 (Ill. App. 2004); *Selmaville Community Consolidated School Dist. No. 10 v. Salem Elementary School Dist. No. 111*, 421 N.E.2d 1087, 1091 (Ill. App. 1981). Whether they can seek a refund of the taxes they paid is less clear, because it is unclear whether the refund statute cited by the parties—the State Officers and Employees Money Disposition Act, 30 ILCS 230/2a,

which was the statutory basis for the casinos' claims in a previous state court action, *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 283 (Ill. 2008)—authorizes the recovery of tax money that has already been disbursed. If the unlawfulness can be traced to the racetracks, the casinos can seek damages from them (as they are trying to do with respect to the two racetracks that it charges with having violated the RICO statute). What the casinos cannot be permitted to do is to freeze the state's tax moneys by imposition of a constructive trust on them.

To summarize my position, the question whether Blagojevich is entitled to absolute immunity from a civil suit challenging his legislative acts while governor should be certified to the Supreme Court of Illinois; the district court's ruling that the plaintiffs' constructive trust claim is barred by the Tax Injunction Act should be affirmed.